HANKERSON *v.* NORTH CAROLINA

No. 75–6568.   Argued February 23, 1977—Decided June 17, 1977

234

White, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, Blackmun, and Stevens, JJ., joined. Blackmun, J., filed a concurring statement, in which Burger, C. J., joined, *post*, p. 245. Marshall, J., *post*, p. 245, and Powell, J., *post*, p. 246, filed opinions concurring in the judgment. Rehnquist, J., took no part in the consideration or decision of the case.

*Lawrence G. Diedrick* argued the cause and filed briefs for petitioner.

*Charles M. Hensey*, Assistant Attorney General of North Carolina, argued the cause for respondent. With him on the brief was *Rufus L. Edmisten*, Attorney General.

Mr. Justice White delivered the opinion of the Court.

The issue in this case is whether the North Carolina Supreme Court correctly declined to give retroactive application to this Court's decision in *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975).

I

Petitioner Hankerson was convicted after a jury trial of second-degree murder and sentenced to 20–25 years in prison. It was conceded at his trial that petitioner killed a man named Gregory Ashe by shooting him through the heart with a pistol at 11 at night on September 29, 1974. The issue at trial was whether petitioner acted in self-defense. The relevant evidence is described below.

Ashe and two friends, Dancy and Whitley, were, according to the testimony of the latter two, driving around in Ashe's

car on the evening of September 29. They went to a pool hall shortly before 11 p. m. and, on discovering that the pool hall was closed, returned to Ashe's car. The car would not start. Ashe asked his companions for a light for his cigarette, but neither had one. Whitley began walking to his home, which was one block away. Ashe and Dancy followed him. Then Ashe decided to return to his car to try to "crank" it. Dancy, according to his and Whitley's testimony, ran after Whitley. Both testified that they then heard a gunshot, heard Ashe yell that he had been shot, and saw petitioner's car speed away. Ashe's body was not found for an hour, and when it was, a fully burned cigarette was lodged between two fingers.

Petitioner testified at trial that he had been driving his car very slowly because of holes in the road when someone asked him for a light. Through his mirror he saw two men. One, i. e., Ashe, walked up to the driver's window. Petitioner pushed his cigarette lighter in and gave it to Ashe. When the lighter was returned, petitioner felt the car shake and saw the other man at the other door, which was locked. Ashe then grabbed petitioner's shoulder with his right hand, and put a knife to petitioner's throat with his left hand. Petitioner then grabbed his gun and shot Ashe. The knife fell inside the car. Petitioner then drove away. Shortly after the murder, the knife was recovered by a policeman from petitioner's car. Petitioner readily admitted the shooting at that time and told a story to the policeman which was roughly equivalent to his trial testimony.

The State then introduced evidence tending to prove that Ashe had never been seen with a knife of the type found in petitioner's car; that petitioner falsely claimed to the policeman—who questioned him shortly after the shooting—no longer to have possession of the gun; that Ashe was right handed, even though petitioner testified that the knife was wielded with Ashe's left hand; and that although petitioner had told police that Ashe had left a grease mark on his shirt

when Ashe grabbed him, Ashe had no grease on his hand when his body was examined. The State argued in its summation that Ashe would not still have had his cigarette in his hand when shot if he had, as petitioner testified, used two hands to attack petitioner.

The jury was instructed, in part, as follows:

"I charge that for you to find the defendant guilty of second degree murder, the State must prove two things beyond a reasonable doubt, first, that the defendant intentionally and *without justification or excuse* and with malice shot Gregory Ashe with a deadly weapon. . . ." [1] App. 9 (emphasis added).

The judge instructed the jury that self-defense constituted an excuse for an intentional killing.[2] However, he instructed the jury:

"If the State proves beyond a reasonable doubt or it is admitted that the defendant intentionally killed Gregory Ashe with a deadly weapon, or intentionally inflicted a wound upon Gregory Ashe with a deadly weapon, that proximately caused his death, the law raises two presumptions; first, that the killing was unlawful, and second, that it was done with malice. . . . Then there will be some other things I will charge you about, but, nothing else appearing, if you are satisfied of those two things beyond a reasonable doubt then you would find the defendant guilty of second degree murder.

". . . [I]n order to excuse his act altogether on the grounds of self-defense, the defendant must prove not beyond a reasonable doubt but simply *to your satisfaction*

---

[1] The second requirement defined by the trial court was that the shooting was the proximate cause of death.

[2] "And in order to *excuse* his act altogether on the grounds of self-defense . . . ." App. 10 (emphasis added). Cf. *Id.*, at 11, 14–15.

that he acted in self-defense." *Id.,* at 10 (emphasis added).[3]

The judge proceeded to instruct on the elements of self-defense.[4] No objection was made to any of these instructions

---

[3] There was a similar instruction on the defendant's burden to satisfy the jury that he acted without malice, that is, that he acted in the heat of passion on sudden provocation. This instruction was challenged in the North Carolina Supreme Court, along with the instruction on self-defense; but we do not reach the question because the state court, although ruling on it as a matter of its own convenience, held that the issue had not been "properly presented" to it in the absence of any evidence that the killing was in the heat of passion on sudden provocation. 288 N. C. 632, 648, 220 S. E. 2d 575, 587 (1975). *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), does not forbid States from requiring the criminal defendant to present at least some evidence to raise a factual issue with respect to heat of passion or self-defense.

[4] "I want to instruct you that to excuse this killing entirely on the grounds of self-defense *the defendant must satisfy you* of four things: first, that it appeared to the defendant and he believed it to be necessary to shoot Gregory Ashe in order to save himself from death or great bodily harm. The defendant testified that at the time he shot Gregory Ashe or shot at Gregory Ashe that Gregory Ashe was holding a knife at his throat and had his arm around him, and he contends that that should satisfy you that he believed it was necessary to shoot him in order to save himself from death or great bodily harm. The second thing that you must be satisfied of—excuse me—that the defendant must satisfy you of is this, that the circumstances as they appeared to him at the time were sufficient to create such belief in the mind of a person of ordinary firmness, and it is for you, the jury, to determine the reasonableness of the defendant's belief from the circumstances as they appeared to him at the time. In making this determination you should consider the circumstances as you find them to have existed from the evidence, including the size, age and strength of the defendant as compared to Gregory Ashe, the fierceness of the assault, if any, upon the defendant, whether or not Gregory Ashe had a weapon in his possession. And the third thing the defendant must satisfy you of is that he was not the aggressor. If he voluntarily and without provocation entered into a fight with Gregory Ashe, he was the aggressor, unless he thereafter attempted to abandon the fight and gave notice to Gregory Ashe

at the trial, and the jury found petitioner guilty of second-degree murder.

Petitioner objected to the above-quoted portions of the instructions to the jury for the first time on direct review in the Supreme Court of North Carolina. He argued that the instructions placed a burden on him to persuade the jury that he was not guilty, by proving that the killing was not unlawful; and he claimed that the Due Process Clause of the Fourteenth Amendment as construed in *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975), required that the State persuade the jury beyond a reasonable doubt as to all elements of the crime, including that of unlawfulness—here the absence of self-defense.

The North Carolina Supreme Court agreed that unlawfulness was an essential ingredient of the crime, 288 N. C. 632, 648–652, 220 S. E. 2d 575, 587–589 (1975), and ruled that under this Court's recently decided cases, the Due Process Clause required that the jury be instructed in a case such as this that the State must persuade it beyond a reasonable doubt that the killing was not in self-defense. Under the presumptions contained in the trial judge's instructions, once an intentional killing with a deadly weapon had been shown, petitioner had the burden to "satisfy" the jury that he had acted in self-defense. The North Carolina Supreme Court held that a burden to "satisfy" the jurors of a fact is not "significantly less" than a burden to persuade them of the fact by a preponderance of the evidence. The court therefore held that the charge was erroneous under this Court's decision in *Mullaney* v. *Wilbur, supra,* which required the

that he was doing so. One enters a fight voluntarily if he uses towards his opponent abusive language which considering all the circumstances is calculated and intended to bring on a fight. And the fourth thing that the defendant must satisfy you of is that he did not use excessive force, that is, more force than reasonably appeared to be necessary to the defendant at the time." App. 11–12. (Emphasis added.)

State to establish all elements of a criminal offense beyond a reasonable doubt and which, despite longstanding practice to the contrary—as in North Carolina since 1864—invalidated presumptions that shifted the burden of proof with respect to such elements to the defendant. The North Carolina Supreme Court stated the rule for future cases:

"If there is evidence in the case of all the elements of self-defense, the mandatory presumption of unlawfulness disappears but the logical inferences from the facts proved may be weighed against this evidence. If upon considering all the evidence, including the inferences and evidence of self-defense, the jury is left with a reasonable doubt as to the existence of unlawfulness it must find the defendant not guilty." 288 N. C., at 651–652, 220 S. E. 2d, at 589.

Petitioner's conviction was nevertheless affirmed, for it was concluded that the constitutional rule announced in *Mullaney* was inapplicable in this case because it was handed down after the conclusion of petitioner's trial.[5] In declining to apply *Mullaney* v. *Wilbur* to trials occurring before the date on which it was decided, the North Carolina Supreme Court recognized that in *Ivan V.* v. *City of New York,* 407 U. S. 203 (1972), we held fully retroactive our earlier decision in *In re Winship,* 397 U. S. 358 (1970), to the effect that the Federal Constitution requires the States to apply the reasonable-doubt standard of proof in juvenile proceedings. It also recognized that, as in *Ivan V.,* it was dealing with a constitutional rule the primary purpose of which was to prevent the erroneous conviction of innocent persons. Even so, the court concluded that the retroactive application of *Mullaney* would have a devastating impact on the administration of justice in this country in view of the number of murderers who would be released—many of whom could not now be retried—in the

---

[5] *Mullaney* was decided on June 9, 1975. Hankerson's trial was on November 21, 1974.

eight States that the court identified as placing the burden of proving self-defense on the defendant. Accordingly, it declined to apply *Mullaney* to trials occurring before the date on which it was decided.

This Court granted Hankerson's petition for a writ of certiorari, which raised the single question whether *Mullaney* should be held retroactive. 429 U. S. 815. The State of North Carolina has filed an answering brief in which it argues (1) that the North Carolina Supreme Court was correct in holding *Mullaney* not retroactive; and (2) that in any event the judgment below should be affirmed because the instructions given in this case did leave the burden of disproving self-defense beyond a reasonable doubt on the prosecution, or at least did not require the accused to prove self-defense by a preponderance of the evidence in contravention of *Mullaney*. These are the only two issues before this Court, and we treat them in order.[6]

## II

The Supreme Court of North Carolina erred in declining to hold retroactive the rule in *Mullaney* v. *Wilbur, supra*. In *Ivan V.* v. *City of New York, supra*, at 204–205, this Court addressed the question whether our decision in *In re Winship, supra*—holding the reasonable-doubt standard applicable to

---

[6] The State as respondent may make any argument presented below that supports the judgment of the lower court. *Massachusetts Mutual Ins. Co.* v. *Ludwig*, 426 U. S. 479 (1976). The State does *not* argue, as an alternative ground in support of the judgment below, that despite *Mullaney* v. *Wilbur*, it is constitutionally permissible for a State to treat self-defense as an affirmative defense that the prosecution need not negative by proof beyond a reasonable doubt. Therefore, we do not address that issue in this case. The Court has said: "We do not reach for constitutional questions not raised by the parties. The fact that the issue was mentioned in argument does not bring the question properly before us." *Mazer* v. *Stein*, 347 U. S. 201, 206 n. 5. (1954) (citations omitted). See generally R. Stern & E. Gressman, Supreme Court Practice, § 6.37 (4th ed. 1969) and cases there cited.

state juvenile proceedings—was to be applied retroactively. The Court there said:

" 'Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances.' *Williams* v. *United States,* 401 U. S. 646, 653 (1971). See *Adams* v. *Illinois,* 405 U. S. 278, 280 (1972); *Roberts* v. *Russell,* 392 U. S. 293, 295 (1968).

"*Winship* expressly held that the reasonable-doubt standard 'is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law". . . . "Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt." To this end, the reasonable-doubt standard is indispensable, for it "impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." ' 397 U. S., at 363–364.

"Plainly, then, the major purpose of the constitutional standard of proof beyond a reasonable doubt announced in *Winship* was to overcome an aspect of a criminal trial that substantially impairs the truth-finding function, and *Winship* is thus to be given complete retroactive effect." 407 U. S., at 204–205.

*Ivan V.* controls this case. In *Mullaney* v. *Wilbur,* as in *In re Winship,* the Court held that due process requires the States in some circumstances to apply the reasonable-doubt standard of proof rather than some lesser standard under which an accused would more easily lose his liberty. In *Mullaney,* as in *Winship,* the rule was designed to diminish the probability that an innocent person would be convicted and thus to overcome an aspect of a criminal trial that "substantially impairs the truth-finding function."

Respondent and the North Carolina Supreme Court seek to avoid the force of *Ivan V.* on two grounds. First, the North Carolina Supreme Court thought that the State had justifiably relied upon the validity of the burden-shifting presumptions flowing from intentional killing with a deadly weapon before *Mullaney* v. *Wilbur,* whereas the State in *Ivan V.* should have known, even before *Winship,* that the reasonable-doubt standard of proof would be held applicable to juvenile proceedings. Second, it viewed the retroactive impact of the *Mullaney* rule on the administration of justice as far more devastating than the retroactive impact of *Winship.* *Winship* involved only juveniles, while *Mullaney* would affect the convictions of murderers.

Respondent recognizes that *Ivan V.* did not rely on the absence of reliance by the State on pre-*Winship* law or on the absence of a devastating impact on the administration of justice. However, respondent claims that in deciding whether a new constitutional rule is to be applied retroactively, the Court has traditionally inquired not only, as in *Ivan V.,* into the purpose of the rule but also into the extent of the State's justified reliance on the old rule and the impact that retroactive application of the new rule would have on the administration of justice. See, *e. g., Stovall* v. *Denno,* 388 U. S. 293 (1967); *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406 (1966); *Linkletter* v. *Walker,* 381 U. S. 618 (1965). It claims that

even where the purpose of the new rule is to improve the "integrity of the factfinding process," the rule has been held nonretroactive when the impact of the new rule on the administration of justice would otherwise be devastating and when the States have justifiably relied on the old rule. See, *e. g.,* *Stovall* v. *Denno, supra* (holding nonretroactive the requirement of *United States* v. *Wade,* 388 U. S. 218 (1967), that counsel be present at a pretrial lineup); *Adams* v. *Illinois,* 405 U. S. 278 (1972) (holding nonretroactive the rule of *Coleman* v. *Alabama,* 399 U. S. 1 (1970), that counsel be present at a preliminary hearing).

The force of *Ivan V.* may not be avoided so easily. It is true that we have said that the question of whether the purpose of a new constitutional rule is to enhance the integrity of the factfinding process is a question of "degree," *Johnson* v. *New Jersey, supra,* at 729; and when the degree to which the rule enhances the integrity of the factfinding process is sufficiently small, we have looked to questions of reliance by the State on the old rule and the impact of the new rule on the administration of justice in deciding whether the new rule is to be applied retroactively. *Stovall* v. *Denno, supra; Adams* v. *Illinois, supra; DeStefano* v. *Woods,* 392 U. S. 631 (1968). But we have never deviated from the rule stated in *Ivan V.* that " '[w]here the *major* purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that *substantially* impairs its truth-finding function and so raises *serious* questions about the accuracy of guilty verdicts in past trials, the new rule [is] given complete retroactive effect.' " 407 U. S., at 204 (emphasis added). The reasonable-doubt standard of proof is as "substantial" [7] a

---

[7] Respondent also argues that the results in very few trials in North Carolina would have been altered by a change in the jury instructions on self-defense because juries do not understand the confusing instructions that were given in this and like cases in the past. *Winship* is said to be distinguishable because the factfinding in juvenile cases is performed by

requirement under *Mullaney* as it was in *Winship*. Respondent's attempt to distinguish *Ivan V.* is without merit.[8]

## III

Respondent next argues in support of the judgment below that the instruction in this case—that the defendant must "satisfy" the jury that he acted in self-defense—is the equivalent of an instruction that the jury should acquit if it entertains a reasonable doubt on the subject, or is so nearly the equivalent of such an instruction that it is not in violation of the rule announced in *Mullaney*, where the burden impermissibly placed on the defendant was to persuade the jury by a preponderance of the evidence. Respondent's argument is squarely contrary to the construction given by the North Carolina Supreme Court to the jury charge in this case. That court concluded that a burden to "satisfy" the jury of self-defense places a burden on a defendant "no greater and at the same time one not significantly less than persuasion by a preponderance of the evidence." 288 N. C., at 648, 220 S. E. 2d, at 587. The Court has no basis for disagreeing with this interpretation of the charge, which is essentially a question of

a judge. We do not so readily assume that juries fail to understand the instructions they have been receiving in North Carolina. See *In re Winship*, 397 U. S. 358, 369–370 (1970) (Harlan, J., concurring).

[8] Moreover, we are not persuaded that the impact on the administration of justice in those States that utilize the sort of burden-shifting presumptions involved in this case will be as devastating as respondent asserts. If the validity of such burden-shifting presumptions were as well settled in the States that have them as respondent asserts, then it is unlikely that prior to *Mullaney* many defense lawyers made appropriate objections to jury instructions incorporating those presumptions. Petitioner made none here. The North Carolina Supreme Court passed on the validity of the instructions anyway. The States, if they wish, may be able to insulate past convictions by enforcing the normal and valid rule that failure to object to a jury instruction is a waiver of any claim of error. See, *e. g.*, Fed. Rule Crim. Proc. 30.

state law.   Since the issue of whether due process requires the prosecution to disprove self-defense beyond a reasonable doubt under North Carolina law was not raised by either party in this case, we decline to consider it now.

*Reversed.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring.

I join the opinion of the Court.   I wish to emphasize, however, that our decision not to consider the correctness of the North Carolina Supreme Court's ruling on the self-defense charge, see *ante,* at 240 n. 6, and this page, does not in any way preclude that court from re-examining its holding in petitioner's case on remand, in light of today's decision in *Patterson* v. *New York, ante,* p. 197.

MR. JUSTICE MARSHALL, concurring in the judgment.

In *Williams* v. *United States,* 401 U. S. 646, 665 (1971), I expressed the view that "a decision of this Court construing the Constitution should be applied retroactively to all cases involving criminal convictions not yet final at the time our decision is rendered."   For reasons persuasively stated at that time by Mr. Justice Harlan, *Mackey* v. *United States,* 401 U. S. 667, 675 (1971), I concluded that "cases still on direct review should receive full benefit of our supervening constitutional decisions."   *Williams* v. *United States, supra,* at 665.   The Court's more recent struggles with the problem of retroactivity, see, *e. g., Adams* v. *Illinois,* 405 U. S. 278 (1972); *Michigan* v. *Payne,* 412 U. S. 47 (1973), have done little to diminish "the inevitable costs and anomalies of the Court's current approach."   *Williams* v. *United States, supra,* at 666. See *Adams* v. *Illinois, supra,* at 286 (Douglas, J., dissenting);

*Michigan* v. *Payne, supra,* at 59 (MARSHALL, J., dissenting). I remain committed to the approach outlined in my opinion in *Williams.** Since this case is here on direct review, I concur in the Court's holding that the rule announced in *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), must be applied.

I would add, in view of MR. JUSTICE BLACKMUN's concurring statement, *ante,* p. 245, that irrespective of the applicability of *Patterson* v. *New York, ante,* p. 197, the North Carolina Supreme Court remains free to construe its own State Constitution to give individuals the same protection that it afforded them in its original decision in this case. See *Manson* v. *Brathwaite, ante,* at 128–129, and n. 9 (MARSHALL, J., dissenting); *United States* v. *Washington,* 431 U. S. 181, 193–194 (1977) (BRENNAN, J., dissenting); *Oregon* v. *Mathiason,* 429 U. S. 492, 499, and n. 6 (1977) (MARSHALL, J., dissenting).

MR. JUSTICE POWELL, concurring in the judgment.

Twelve years ago this Court decided *Linkletter* v. *Walker,* 381 U. S. 618 (1965). In the intervening years, we have struggled with the question of retroactivity when new constitutional rules affecting the administration of the criminal law have been adopted. See Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va. L. Rev. 1557, 1558–1596 (1975). The retroactivity doctrine that has emerged is far from satisfactory. Although on several occasions I have joined in its application, I am now persuaded that it would be wiser to adopt the view urged by Mr. Justice Harlan in *Mackey* v. *United States,* 401 U. S. 667, 675–702 (1971) (separate opinion). See also *Desist* v. *United States,* 394 U. S. 244, 256–269 (1969) (Harlan, J., dissenting); *Williams*

---

*As I noted in *Williams,* I think there are persuasive reasons to use the Court's traditional retroactivity analysis to decide that issue in cases arising on habeas corpus or other collateral-review proceedings. 401 U. S., at 666.

v. *United States,* 401 U. S. 646, 665–666 (1971) (MARSHALL, J., concurring in part and dissenting in part).

When the Court declines to hold a new constitutional rule retroactive, one chance beneficiary—the lucky individual whose case was chosen as the occasion for announcing the new principle—enjoys retroactive application, while others similarly situated have their claims adjudicated under the old doctrine. This hardly comports with the ideal of "administration of justice with an even hand." *Desist* v. *United States, supra,* at 255 (Douglas, J., dissenting).[1]

On the other hand, the holding that a new constitutional principle is fully retroactive also may result in serious costs. Convictions long regarded as final must be reconsidered on collateral attack; frequently they must be overturned for reasons unrelated to the guilt or innocence of the prisoner, and in spite of good-faith adherence on the part of police, prosecutors, and courts to what they understood to be acceptable procedures. Society suffers either the burden on judicial and prosecutorial resources entailed in retrial or the miscarriage of justice that occurs when a guilty offender is set free only because effective retrial is impossible years after the offense. Reopening a case also carries disadvantages for those who have been convicted:

> "Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community." *Sanders* v. *United States,* 373 U. S. 1, 24–25 (1963) (Harlan, J., dissenting).

---

[1] In addition, as Mr. Justice Harlan noted, the typical nonretroactivity decision often places the Court in the role of a legislature rather than that of a judicial tribunal. *Mackey* v. *United States,* 401 U. S., at 677–681.

See *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 262 (1973) (POWELL, J., concurring).

A different approach to the retroactivity question is available. Described in detail in Mr. Justice Harlan's separate opinion in *Mackey, supra,* it contemplates, in rough outline, that courts apply a new rule retroactively in cases still pending on direct review, whereas cases on collateral review ordinarily would be considered in light of the rule as it stood when the conviction became final.[2] Mr. Justice Harlan marshaled compellingly the reasoning supporting this view, 401 U. S., at 675–698, and for me to repeat the arguments here would be pointless. I note simply that this approach is closer to the ideal of principled, evenhanded judicial review than is the traditional retroactivity doctrine. At the same time it is more attuned to the historical limitations on habeas corpus, see *Stone* v. *Powell,* 428 U. S. 465 (1976), and to the importance of finality in a rational system of justice. See *Blackledge* v. *Allison,* 431 U. S. 63, 83 (1977) (POWELL, J., concurring).

The case before us is here on direct review. I therefore agree with the Court that Hankerson is entitled to retroactive application of the *Mullaney* rule. Accordingly, I concur in the judgment.

---

[2] Mr. Justice Harlan described two exceptions under which a new rule occasionally would be applied retroactively even on collateral review. *Id.,* at 692–695. The case he makes for these exceptions is persuasive, but I save for another day when the question is squarely presented a decision on when such exceptions are appropriate. See also *Williams* v. *United States,* 401 U. S., at 666 (MARSHALL, J., concurring in part and dissenting in part).