Willie Lee PIGEE, Petitioner,

v.

Thomas R. ISRAEL, Respondent.

Civ. A. No. 80–C–704.

United States District Court,
E. D. Wisconsin.

Dec. 22, 1980.

Ben Kempinen, Legal Assistance to Institutionalized Persons Program, Madison, Wis., for petitioner.

Dorothy H. Dey, Asst. Atty. Gen., Madison, Wis., for respondent.

## DECISION AND ORDER

TERENCE T. EVANS, District Judge.

Before the court is the petition of Willie Lee Pigee for the issuance of a writ of habeas corpus.

This petition is one of many submitted following the decision in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), declaring unconstitutional a Montana jury instruction involving criminal intent. The Supreme Court found that the instruction could have been interpreted by the jury in a manner that would deny a defendant his right to due process of law. Because a Wisconsin jury instruction used at petitioner's trial for attempted murder was similar to the Montana instruction, he argues that it too is unconstitutional and his conviction, consequently, must be set aside.

## FACTS

Willie Lee Pigee was charged with two counts of attempted murder arising out of the events occurring at the Club Marquis in Racine, Wisconsin, on April 16, 1972. Alvernest Woodson, Myrna Kennedy, and Mr. and Mrs. Walter Baker traveled from Milwaukee to Racine, arriving at the Club around midnite. They seated themselves at a table. Soon afterward, Mr. Pigee approached the table and asked Mrs. Baker to dance. She accepted. After the dance, Pigee commented on the clothing Mrs. Kennedy was wearing, by saying something about "hot pants." When Mrs. Kennedy and Mr. Woodson began to dance, Pigee approached Woodson and said Kennedy had "nothing but drawers on." According to some testimony in the record, Pigee seemed upset and preoccupied with Mrs. Kennedy's clothing. Mrs. Baker testified that he stated he "would like to kill ... shoot him a nigger anyway."

Mrs. Baker noticed that Pigee had a gun under his trench coat and urged her friends to leave. As they began to leave, Pigee was between them and the door. The Bakers got out of the door but Mrs. Baker returned to see Woodson falling to the floor.

Mrs. Kennedy testified that Pigee raised a gun and confronted her at the door. She said she asked him, "Man, what we done to you? We don't even know you. Why?" She turned to go back into the club when she was shot in the arm. She then saw Mr. Woodson holding his chest which was bleeding. She said Pigee approached Woodson, saying he would "blow his mother fucking brains out," and that Woodson was begging for his life, saying "Why? Man, don't shoot me. Why?" Woodson and other witnesses testified to essentially the same events.

A Special Agent with the Federal Bureau of Investigation testified that in order to fire the gun involved in the incident, one must both depress the grip safety and pull the trigger. Both actions must be taken each time the weapon is fired.

The defense, through cross-examination of a prosecution witness, James Powell, the operator of the bar, established that a man had been shot in the same tavern a year prior to this incident, and that Powell kept a gun behind the bar to keep peace.

The defense produced witnesses who stated that the first shot that was fired went into the air, and that Mrs. Kennedy jumped in front of Mr. Woodson before she was shot.

The defendant himself took the stand and testified that he had been looking at Mrs. Kennedy when Mr. Woodson said, "something about busting my head if I kept looking," and that if he had some money he could "have a good time." He also testified that Mrs. Kennedy put her purse on a chair between her and Mr. Woodson and opened it. Mr. Pigee said he thought that she, like other women he knew, had a pistol in her purse.

Pigee also testified that Woodson attacked him, and that he (Pigee) pulled the pistol, "but not intentional to shoot him. I was trying to bluff him." He stated again, "I didn't shoot him intention to." Later he stated, "I didn't shoot either one intentionally. It was the gun went off you know."

At the close of the prosecution's case, the defense moved to dismiss the count involving the shooting of Mrs. Kennedy, arguing that there was no evidence in the record to show that Pigee intentionally attempted to kill Mrs. Kennedy. The motion was denied.

As part of the charge to the jury in this case, the trial judge defined "intent to kill" in part stating:

"... While this intent to kill must be found as a fact before you can find the defendant guilty of attempted first degree murder in Count # 1 and Count # 2, it must be found, if found at all, from his acts, his words, his statements, if any, bearing upon his intent. You cannot look into a man's mind to find out his intent. When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all the natural probable and usual consequences of his deliberate acts. If one person assaults another violently with a dangerous weapon, likely to kill, then when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended."

The instruction above, which forms the basis of the defendant's request for a writ, was not objected to. The jury found Pigee guilty of attempting to murder Woodson and not guilty of attempting to murder Mrs. Kennedy. Judgment was entered on the verdict and Pigee was sentenced to serve a term of 20 years.

In resisting Pigee's request for a writ, the state argues that he waived his right to challenge the instruction by not objecting before it was given, and that he cannot raise the issue here because he failed to exhaust his state remedies. On the merits, the state argues that the instruction given differs from that given in *Sandstrom* and is not erroneous. Alternatively, the state argues that if the giving of the instruction was error, the error was harmless. Failing all else, the state contends that *Sandstrom* should not be applied retroactively.

## PROCEDURAL OBJECTIONS

In *Sandstrom*, the case upon which the defendant relies, the defense specifically objected to the giving of the questioned instruction, arguing that it "... has the effect of shifting the burden of proof on the issue of [intent]." No objection was made to the giving of the instruction in this case.

Like most states, Wisconsin has adopted a contemporaneous objection rule, § 972.10(5) Stats. Its purpose is to encourage correction of trial errors in an efficient and timely manner and to avoid repetitive litigation. A procedural rule like Wisconsin's serves a legitimate state interest and does not offend the due process clause of the United States Constitution. *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

To be effective, however, a waiver must be intelligent. It must amount to "an intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Because intent was an issue in this case, I can see no reason why the defendant would have intentionally refused to object to the challenged instruction. Unlike other habeas petitions raising this issue and pending in this court, the petitioner here cannot be said to have knowingly waived his right to challenge the instruction.

The state's claim of failure to exhaust remedies is also not an impediment to review here. Because the Wisconsin Supreme Court has found the challenged instruction to be constitutionally antiseptic, *Muller v. State*, 94 Wis. 2d 450, 289 N.W.2d 570 (1974), no further state court activity is necessary as a condition precedent to my consideration of the issue. *See Ross v. Israel*, 503 F.Supp. 131, decided by Judge Gordon of this district on November 21, 1980.

## THE MERITS

■ *Sandstrom, supra,* must be considered with a second case decided the same term, *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). In these cases, the court approached the question at hand by analyzing various types of presumptions, stating that inferences and presumptions are "a staple of our adversary system of factfinding." In a criminal case, however, a presumption must not be used to alleviate the state's burden of proving the elements of a crime beyond a reasonable doubt.

A permissive inference or presumption allows, but does not require, a trier of fact to infer the elemental fact from proof by the prosecutor of an evidentiary fact and places no burden of any kind on the defendant. A mandatory presumption, on the other hand, affects not only the " 'no reasonable doubt' burden but also the placement of that burden." *Ulster County,* at 157, 99 S.Ct. at 2224. It requires that the trier of fact find the elemental fact upon proof of the basic fact, unless the defendant comes forward with evidence to rebut the connection between the two.

Mandatory presumptions can be of two kinds. The first kind can direct a certain finding unless the defendant offers some evidence to the contrary, that is, it shifts the burden of production. The second kind requires the defendant to assume the burden of persuasion, in effect requiring him to prove that he lacked intent by some "quantum of proof which may well have been considerably greater than 'some' evidence." *Sandstrom,* 442 U.S. at 517, 99 S.Ct. at 2456.

A conclusive presumption is "an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption." *Sandstrom,* at 517, 99 S.Ct. at 2456.

The exact question here is not what sort of presumption is involved in Pigee's instruction, but how a reasonable jury could have interpreted the instruction, that is, whether they would have treated it as permissive, mandatory or conclusive.

In *Sandstrom, supra,* the instruction was that "the law presumes that a person intends the ordinary consequences of his voluntary acts." According to the court, the jury was not told that it had a choice, and thus it could have viewed the instruction as mandatory. The instruction was declared unconstitutional.

*Ulster County Court, supra,* involved a statutory presumption and an accompanying jury instruction. The statute stated that the presence in an automobile of a firearm is, with certain exceptions, "presumptive evidence of its possession by all persons occupying such automobile." New York Penal Law, § 265.15(3), quoted 442 U.S. at 142, 99 S.Ct. at 2217. The judge instructed the jury as follows:

"Our penal law also provides that the presence in an automobile of any machine gun or of any handgun or firearm which is loaded is presumptive evidence of their unlawful possession.

"In other words, these presumptions or this latter presumption upon proof of the presence of the machine gun and the hand weapons, you may infer and draw a conclusion that such prohibited weapon was possessed by each of the defendants who occupied the automobile at the time when such instruments were found. The presumption or presumptions is effective only so long as there is no substantial evidence contradicting the conclusion flowing from the presumption, and the presumption is said to disappear when such contradictory evidence is adduced....

"The presumption or presumptions which I discussed with the jury relative to the drugs or weapons in this case need not be rebutted by affirmative proof or affirmative evidence but may be rebutted by any evidence or lack of evidence in the case."

Of this instruction, the court in *Ulster County* stated:

"The trial judge's instructions make it clear that the presumption was merely a part of the prosecution's case, that it gave rise to a permissive inference availa-

ble only in certain circumstances, rather than a mandatory conclusion of possession, and that it could be ignored by the jury even if there was no affirmative proof offered by defendants in rebuttal."

The Wisconsin Supreme Court has considered the question of the effect of *Sandstrom, supra,* on the instruction given by the trial judge in this case. *See, Muller v. State,* 94 Wis.2d 450, 289 N.W.2d 570 (1979). The court found the Wisconsin instruction to be significantly different from the Montana instruction given in *Sandstrom.*

The Wisconsin Supreme Court found that the Wisconsin instruction states a rebuttable presumption which does not shift the burden of persuasion to the defendant on the intent element of the crime and that "no reasonable juror could interpret it as such." It does not require the defendant to come forward with an amount of proof greater than "some evidence." Therefore, the court concluded that the instruction did not violate the defendant's constitutional rights.

A strong dissent points out, however, that other appellate courts and federal district courts in Wisconsin had interpreted the Wisconsin instruction differently. In *Genova v. State,*[1] 91 Wis.2d 595, 283 N.W.2d 483 (Ct.App.1979), the instruction was found to state a permissive presumption. In *Adams v. State,* 92 Wis.2d 875, 289 N.W.2d 318 (Ct.App.1979), the court found that a reasonable juror could have interpreted the instruction to shift the burden of persuasion to the defendant, and that it was therefore unconstitutional. The U.S. District Court for the Eastern District of Wisconsin (Reynolds, J.) also declared a similar instruction unconstitutional on the basis that it shifted the burden of persuasion. *See, Dreske v. Wisconsin Department of Health and Social Services,* 483 F.Supp. 783 (E.D. Wis.1980).

The Wisconsin instruction[2] is not identical to the Montana instruction given in *Sandstrom.* Neither is it as clearly a permissive inference as the instruction given with approval in *Ulster County.* The issue here is whether the additional phrase in the Wisconsin instruction—including "when there are no circumstances to prevent or rebut the presumption"—is sufficient to alert a reasonable jury to the fact that they are free to reject the presumption.

■ Recognizing that the important question is what a reasonable jury might have thought, not what a court thinks, I will nonetheless set forth my reasons for a belief that the instruction does not shift the burden of persuasion to the defendant. At most, the instruction requires that a doubt be raised in the jury's mind as to defendant's intent. In some cases, this requirement may shift the burden of production to a defendant.

In order to rebut the presumption, all that is required is that there be "circumstances" present to prevent the effect of the presumption. The situation is distinguishable from that in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 41 L.Ed.2d 508 (1975), of which *Sandstrom* is based. *Mullaney* involved a Maine law which provided that "absent justification or excuse, all intentional or criminally reckless killings are felonious homicides. Felonious homicide is punished as murder . . . unless a defendant proves by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation . . ." at 691, 692, 95 S.Ct. at 1885, 1886. In Maine, the shifting of the burden to the defendant was explicit, and it required that he produce a fair preponderance of evidence. The court stated:

"We therefore hold that the due process clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." at 704, 95 S.Ct. at 1892.

---

**1.** The well–reasoned decision of Chief Appellate Judge John Decker in *Genova* is particularly persuasive.

**2.** The instruction given in Pigee's trial will be referred to as the "Wisconsin instruction" during the balance of this instruction.

The Wisconsin instruction cannot be said to explicitly shift the burden of persuasion and certainly does not require that the defendant produce "a fair preponderance" of evidence. The instructions in Pigee's case, viewed as a whole, emphasize the presumption of innocence and the fact that the state bears the burden of proof "beyond a reasonable doubt" on all elements of the offense. The most the presumption instruction can require in this situation is that a reasonable doubt be raised in the minds of jurors.

That doubt can arise out of the circumstances of the crime, not necessarily only out of the evidence put on by the defense. The instruction does not explicitly require that the defendant affirmatively make any showing to rebut the presumption. In some ways, what was said about the *Ulster County* instruction can be said of this instruction:

> "It could be ignored by the jury even if there was no affirmative proof offered by defendants in rebuttal."

On the issue of intent, circumstantial evidence is almost always required. In Pigee's case, witnesses report his statement that he would like to "shoot him a nigger anyway". However, such statements are not always made. Thus, often a finder of fact must infer from "deliberate acts" what was intended. Similarly, often circumstantial evidence of lack of intent is present. Evidence of drunkenness and deranged actions, for example, does not necessarily come from the defense; it may appear during the prosecution's case. The Wisconsin instruction, though not as clear as it could be, informs the jury that circumstances can raise doubts in their minds, doubts which cause the presumption to be ineffective.

It is true that in certain cases where the prosecution has an airtight case, a defendant might be required to produce "some evidence" to raise a reasonable doubt, i. e. the burden of production might be shifted. It is not clear from *Sandstrom, supra,* whether it is constitutional to shift the burden of production; nor is it clear what analysis a court must use on this sort of presumption.

It seems clear, however, that an instruction which in some cases may require a defendant to produce some evidence, does not remove the obligation of the state to prove the elements of an offense beyond a reasonable doubt. In a trial, once the elements of an offense are established, including circumstances that indicate the presence of intent, a defendant will probably be convicted unless he raises a reasonable doubt in the jury's minds. How else, one must ask, is a trial to be run?

■ However, as stated above, how this court, or in fact how any court, interprets the instruction is not precisely the issue; the issue is what the court believes a reasonable juror will make of the instruction. I conclude that no reasonable juror could have interpreted the instruction as given in this case in an unconstitutional manner. Were a misinterpretation possible, I would find that the giving of the instruction in this case was harmless error.

As noted above, the court in *Sandstrom* reversed; however, it remanded the case to the Montana Supreme Court to consider unaddressed issues, including whether the giving of the tainted instruction could be considered harmless error. The fact that the Court intended that harmless error was a doctrine applicable to this issue is established to my satisfaction by its refusal to hear *McKenzie v. Montana,* 608 P.2d 428 (Mont.1980). The Supreme Court of Montana, which had for the second time been instructed to reconsider the case, reaffirmed a conviction and reinstated the death penalty. One of the issues was whether the very instruction declared unconstitutional in *Sandstrom* constituted harmless error. Adopting the approach set forth in *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972)—that is, excluding the unconstitutional infirmity where overwhelming evidence supports the conviction—Montana determined that the error was harmless. On December 8, 1980, the United States Supreme Court refused to grant certiorari in *McKenzie.*

The standard for harmless constitutional error is set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967):

> "... Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

It is harmless if the error did not contribute to the conviction. *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

In addition to the Wisconsin instruction, Pigee's jury was instructed that he was protected by a presumption of innocence throughout the trial, "and that the presumption prevails at its close unless it is overcome by evidence which satisfies the jury of his guilt beyond a reasonable doubt. The defendant is not required to prove his innocence. The burden of proving the defendant guilty of every element of the crime charged is upon the state."

The primary issue at trial was the intent of defendant. There was testimony that Pigee was hostile to the victims, that he commented on Mrs. Kennedy's clothing, that he stated that he "would like to kill ... shoot him a nigger anyway" and that his gun was a "safe" weapon, requiring two specific actions to fire it. In addition, the testimony showed that the gun was fired at least three times. On the other hand, Mr. Pigee testified that he thought Mrs. Kennedy had a gun in her open purse, and that while he had pulled the pistol on Mr. Woodson, he did not do it "intentional to shoot him. I was trying to bluff him." At another time he stated, "I did not pull the trigger with the intention to pull the trigger."

The fact is that the evidence showed that he did shoot both Mr. Woodson and Mrs. Kennedy. Had the jury merely plugged in a presumption as if it were conclusive, or as if it shifted the burden of persuasion to him, logic indicates that they would have found Pigee guilty of both counts of attempted murder. Rather, the fact that they found him guilty of one count and not guilty of the other indicates that they looked carefully at the evidence and did not find themselves directed blindly by a mandatory presumption. Thus, I can comfortably state the required belief that any error in the instruction under consideration was harmless beyond a reasonable doubt.

■ While I have concluded that the Wisconsin instruction was not error and, alternatively, if error, the error was harmless, the question of retroactivity deserves mention. Assuming *Sandstrom* mandates a finding that the Wisconsin instruction is improper and more than harmless error, I would conclude that the holding should not be afforded retroactive application. The standard for retroactive application is set forth in *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967):

> "The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

*Stovall* cited with approval *Tehan v. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), in which the court found that *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), should not be retroactively applied. *Griffin* established that the Fifth Amendment's privilege against compulsory self–incrimination is also protected by the Fourteenth Amendment against abridgement by the states; specifically, the court stated that it constitutes constitutional error for a state prosecutor to comment on a defendant's failure to testify at trial. In *Tehan*, the court refused to apply the rule retroactively, reasoning that the purpose behind the privilege against self–incrimination was not to protect the innocent from conviction but to insure that even the guilty are not convicted unless "the prosecution 'shoulders the entire load'." 382 U.S. at 415, 86 S.Ct. at 464. Unlike other doctrines made retroactive, "the Fifth Amendment's privilege against self–incrimination is not an adjunct to the ascertainment of truth." at 416, 86 S.Ct. at 465. Further-

more, the court noted that the states have relied upon a rule contrary to *Griffin* for "more than half a century" and that applying the new rule retroactively would have a grave effect on the administration of criminal justice.

On the other hand, in *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977), the court declared that *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), discussed above, should be retroactive. The court found that the ruling of *Mullaney* went to the integrity of the fact finding process. However, the court reaffirmed that the "question of whether the purpose of a new constitutional rule is to enhance the integrity of the fact-finding process is a question of 'degree,' . . . and when the degree to which the rule enhances the integrity of the factfinding process is sufficiently small, we have looked to questions of reliance by the state on the old rule and the impact of the new rule on the administration of justice in deciding whether the new rule is to be applied retroactively." *Hankerson*, 432 U.S. at 243, 97 S.Ct. at 2345.

As stated above, while this court finds *Mullaney* to involve an explicit shifting of the burden to the defendant, it is doubtful that even the burden of production is shifted under the Wisconsin instruction. The "degree" to which the Wisconsin instruction affects the factfinding process is more analogous to *Griffin* than *Mullaney*. It is sufficiently small so as to require a look at the impact a sweeping decision could have on the administration of justice in Wisconsin.

Twenty–nine pattern Wisconsin jury instructions[3] contained "presumption of intent language", including the instruction for first degree murder. The Wisconsin Division of Corrections states that between 1962, when the instruction was adopted, and 1979, when *Sandstrom* was decided, more than 300 persons were convicted of first degree murder in this state, no doubt many during trials in which the instruction was

given. If *Sandstrom* is retroactively applied, many of those cases would have to be retried. The resultant burden on the criminal justice system and the terrible personal burden on the witnesses and the families and friends of victims convince me that the ruling must not be retroactively applied.

IT IS THEREFORE ORDERED that petitioner's request for the issuance of a writ of habeas corpus is denied.

---

**3.** Apparently recognizing the unsettled law in this area, the Wisconsin Uniform Criminal Jury Instruction Committee wisely recommended, on September 30, 1977, that the instruction be altered.