**UNITED STATES OF AMERICA,**

v.

**Michael Emerson SIEGELBAUM, Defendant.**

No. CR 02–179–01–PA.
No. CV 04–1380–PA.

United States District Court,
D. Oregon.

Jan. 26, 2005.

Michael Emerson Siegelbaum, Portland, OR, pro se.

Karin J. Immergut, US Attorney's Office, Portland, OR, for Plaintiff.

OPINION AND ORDER

PANNER, District Judge.

Michael Siegelbaum pled guilty to bank fraud, and was sentenced to 70 months in custody, and a 5–year term of supervised release. After the decision in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), Siegelbaum filed a motion under 28 U.S.C. § 2255, alleging that his sentence had been unlawfully enhanced by facts not found by a jury. Siegelbaum challenges the nine-level upward adjustment for amount of loss, the two-level upward adjustment for more than minimal planning, and the four-level upward adjustment for role in the offense.

The Base Offense Level, for the offense of conviction, was six. Siegelbaum's Criminal History Category is VI. After deducting two levels for acceptance of responsibility, the Total Offense Level would be four, with a guidelines range of six to twelve months. The additional 58 months of the sentence imposed upon Siegelbaum are attributable to the challenged enhancements. Siegelbaum contends he has already served more than the twelve month sentence he could have received absent the sentencing enhancements, hence he is entitled to be released immediately.

## A. *The Motion is Timely*

The motion is timely, having been filed just three months after *Blakely* was decided, and prior to the opinion in which the Supreme Court first applied *Blakely* to the federal Sentencing Guidelines. *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621, 2005 WL 50108 (Jan. 12, 2005). I reject the government's suggestion that no court may even consider Siegelbaum's § 2255 motion unless and until the Supreme Court declares that *Booker* and *Blakely* apply retroactively to cases on collateral review.

The government cites no authority for the proposition that only the Supreme Court may make an initial retroactivity determination. *Cf. Dodd v. United States,* 365 F.3d 1273, 1278 (11th Cir.2004) ("every circuit to consider this issue has held that a court other than the Supreme Court can make the retroactivity decision for purposes of § 2255(3)"), *cert. granted,* —— U.S. ——, 125 S.Ct. 607, 160 L.Ed.2d 456 (2004). Some Circuits even hold that the one-year limitations period in § 2255 begins to run when the new rule is first announced, not when it is finally declared retroactive. *See, e.g., id.* at 1279–81.

The government's reasoning is also circular. The Supreme Court often will not determine whether a rule applies on collateral review until it decides a case actually presenting that issue—yet under the view advanced by the government, such a case might never be entertained. At a minimum, years might elapse before a test case made its way through the lower courts and was decided by the Supreme Court. In the meantime, Siegelbaum will continue to be unlawfully imprisoned, assuming for the moment that his arguments are meritorious. The interpretation of § 2255 that the government urges here could raise serious constitutional concerns.

The cases cited by the government are distinguishable. Each involved a motion for leave to file a second or successive § 2255 motion. Siegelbaum has not previously filed a § 2255 motion. As the government's brief acknowledges, the statutory language governing initial § 2255 motions differs from that governing successive motions.

The statutory language governing initial § 2255 motions establishes a limitations period, the latest date on which the motion may be filed, not the earliest date.

## B. *Whether Blakely and Booker Apply Retroactively to Cases on Collateral Review*

■ The Supreme Court has not yet stated whether the rule announced in *Blakely* and *Booker* applies retroactively to cases on collateral review. The lower-court decisions that the Court was reviewing were direct appeals. Discussion of retroactivity would have been gratuitous, and was not briefed. Consequently, no inference can be drawn from the Court's failure to discuss that issue.

In ascertaining whether *Booker* applies retroactively, the first step is to clarify what rule the Court announced, a process complicated here by the unusual alignment of justices. The *remedy* endorsed by five members of the Court (which made the Sentencing Guidelines advisory) must not be confused with the constitutional *violation* at issue. The constitutional violation was the enhancement of a sentence, above the "statutory maximum," based upon facts neither admitted by the defendant nor found by a jury to be true beyond a reasonable doubt. *Booker,* 125 S.Ct. at ——.

■ The second step in analyzing retroactivity is to determine whether *Blakely* and *Booker* announce a "new" rule. A "case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became

final." *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). Siegelbaum's conviction was final in December 2002, after the decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Although *Blakely* and *Booker* are extensions of *Apprendi,* the latter's application to the federal sentencing guidelines was not "dictated" by *Apprendi.* Prior to *Blakely,* every Circuit that considered the question concluded that *Apprendi* did not apply to the federal sentencing guidelines. *See, e.g., United States v. Hernandez–Guardado,* 228 F.3d 1017, 1026–27 (9th Cir.2000).

Whether *Booker* was dictated by *Blakely* presents a closer question, but it is one I need not decide today. Siegelbaum's conviction became final before either *Booker* or *Blakely* was announced. Even if *Booker* were dictated by *Blakely,* it would still constitute a new rule so far as Siegelbaum is concerned.

The next step is to decide whether the new rule is "substantive" or "procedural." A rule is substantive, for the present purpose, if it alters the range of conduct or the class of persons the law punishes. Rules that regulate only the manner of determining the defendant's culpability are procedural. *Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442 (2004). Applying this definition, the rule announced in *Blakely* and *Booker* is procedural.

New substantive rules generally apply retroactively, because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal" or faces a punishment the law cannot impose upon him. *Id.* at 2522–23 (internal citations and punctuation omitted). New rules of procedure generally are not retroactive. They "merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence," retroactive effect is given en "to only a small set of 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* at 2523 (citations omitted). That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is seriously diminished." *Id.* (citations omitted).

The government asserts that retroactive application of *Blakely/Booker* is foreclosed by *Schriro.* That is only partly true. *Schriro* held that a rule "requiring that a jury rather than a judge find the essential facts bearing on punishment" in capital cases would not be applied retroactively to cases on collateral review. *Id.* at 2523–26. The Court was not persuaded that accuracy is so seriously diminished by judicial factfinding as to produce an impermissibly large risk of injustice. *Id.*

*Schriro* addressed only the allocation of factfinding responsibility between the judge and jury. There is a second component to *Blakely/Booker* that *Schriro* did not address, namely, that facts used to enhance a sentence, if not admitted, must be proven beyond a reasonable doubt rather than by a preponderance of the evidence.

The Supreme Court has acknowledged that the standard of proof can significantly impact factfinding accuracy and society's confidence in the result. *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error") and at 364 ("the reasonable-doubt standard is indispensable to command the respect and

confidence of the community in applications of the criminal law"); *Ivan V. v. City of New York*, 407 U.S. 203, 205, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972) (purpose of reasonable doubt standard is "to overcome an aspect of a criminal trial that substantially impairs the truth-finding function, and *Winship* is thus to be given complete retroactive effect"); *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) (giving retroactive effect to rule requiring proof of all elements of crime beyond a reasonable doubt and voiding presumptions that shift burden of proof to defendant).

*Winship, Ivan V.*, and *Hankerson* predate the retroactivity standard announced in *Teague.* Those decisions also concerned the validity of the underlying conviction, rather than a sentence enhancement. On the other hand, at least five Justices have said that sentence enhancements are of sufficient importance to warrant application of the reasonable doubt standard in some instances. *See Apprendi, Blakely,* and *Booker, supra.* Given this history, I cannot exclude the possibility that the Court might apply *Blakely/Booker* retroactively in some situations.

The government also argues that retroactivity is controlled by *United States v. Sanchez–Cervantes*, 282 F.3d 664, 671 (9th Cir.2002). I disagree. *Sanchez–Cervantes* held that *Apprendi* was not entitled to retroactive application. In reaching that conclusion, the panel relied upon a narrow interpretation of *Apprendi* that has now been repudiated in *Blakely* and *Booker.* As the concurring opinion by Judge Hug observed, if the panel's understanding of *Apprendi* was mistaken, then "the *Teague* analysis would be quite different." *Sanchez–Cervantes*, 282 F.3d at 673.

The bottom line is that existing precedent does not definitively answer whether the rule announced in *Blakely/Booker* applies retroactively. Nevertheless, existing precedent does provide sufficient guidance to resolve Siegelbaum's motion.

## C. *Siegelbaum is Not Entitled to Relief*

Under the standards first articulated in *Teague*, the only apparent justification for retroactive application of *Blakely/Booker* would be to redress potential miscarriages of justice resulting from an inaccurate fact-finding procedure.

Even assuming (but *not* deciding) that the rule announced in *Blakely/Booker* applies retroactively, relief would be limited to persons presently serving a sentence that was enhanced on the basis of *contested facts* that were not found to be true, beyond a reasonable doubt, nor admitted by the defendant. Only if a defendant actually disputed the facts that resulted in the sentence enhancement, and the court decided the matter against him, can the defendant show that he may have been prejudiced by application of the wrong standard of proof.[1] To vacate a sentence enhancement on the basis of *Blakely/Booker*, when a defendant never disputed the facts upon which that enhancement was premised, would confer an unwarranted windfall.[2]

■ Applying the foregoing standards, Siegelbaum is not entitled to relief. The

---

**1.** Even then, a defendant would not necessarily be entitled to a reduced sentence. Arguably, he is entitled only to have the sentencing facts adjudicated under the proper standard of proof. Such questions must await another day, as I resolve Siegelbaum's § 2255 motion on other grounds.

**2.** This discussion presumes that a defendant had an opportunity to contest the sentencing facts, if he wished to do so, as was the practice under the federal sentencing guidelines. I do not consider how *Blakely/Booker* might apply to the various state court sentencing schemes, which may operate differently than the federal model.

58–count indictment accused Siegelbaum of leading a bank fraud scheme. Eight other persons were indicted with Siegelbaum. All eventually pled guilty.

Siegelbaum agreed to plead guilty to a single count of bank fraud, involving an $8,900 check. The plea agreement makes clear that Siegelbaum's criminal conduct was more extensive. In that agreement, Siegelbaum stipulated to an order requiring him to pay $281,000 in restitution to the bank. Implicit in that stipulation is an acknowledgment that the loss to the bank greatly exceeded $8,900. The letter appended to, and made a part of, the plea agreement, recites in relevant part that:

3. The parties have reached the following agreements with respect to sentencing. . . . Because the attempted loss attributed to the conspiracy was in excess of $350,000, your client is subject to an additional 9–level increase in his offense level. In addition, because the offense involved more than minimal planning, your client should receive a 2–level enhancement under 2F2.2(b)(2). Furthermore, your client should receive a 4–level increase for being an organizer or leader * * * *

4. In exchange for the agreements set forth in this letter, the government agrees to recommend that defendant receive a 3–level adjustment for acceptance of responsibility pursuant to guideline section 3E1.1, which would result in a guideline range of 57–71 months prison. Because of the extensive nature of the defendant's crime, the fact that at least 44 victims were involved, and the facts [sic] that the defendant had in his possession sophisticated document-

making equipment, the parties agree that the defendant should receive a sentence of 70 months.

5. In exchange for the agreements set forth above, defendant agrees to waive his right to appeal his conviction or sentence in this case so long as the sentence imposed by the court is consistent with the above sentencing guidelines recommendations. In addition, the government agrees not to supersede the indictment to charge defendant in the substantive bank fraud counts that are now alleged against his coconspirators.

During the plea colloquy, the court carefully reviewed the agreement with Mr. Siegelbaum to ensure that he understood its terms. The prosecutor called the court's attention to the provisions whereby the parties agreed that 70 months was the appropriate sentence, and that "Mr. Siegelbaum will not have a right to ask for a downward adjustment under our agreement." Siegelbaum and his attorney both confirmed that this comported with their understanding of the plea agreement.

Before accepting the plea, the court asked why Siegelbaum was agreeing to pay restitution of $281,000, when the count to which he was pleading guilty involved an $8,900 transaction. The prosecutor explained that "this is part of a much larger conspiracy involving 99 transactions, and the amount, the total potential loss was the amount of $342,000. The actual loss was $272,178."[3] Siegelbaum's attorney then confirmed that $281,000 was the correct sum of restitution.

The prosecutor also represented that, at trial, the government believed it could

---

**3.** The PSR indicates that, in addition to the $342,000 mentioned by the AUSA, Siegelbaum was involved in cashing other forged or counterfeit checks, hence the total attempted loss was $355,293.83. Adding those other checks to the $272,000 figure mentioned by the AUSA resulted in a total actual loss of $281,203.83.

prove "Mr. Siegelbaum was the person who recruited others, providing false IDs ... that he created, providing them with unauthorized or stolen checks, and had them go from bank to bank, and then he received 50 percent of the proceeds." His "co-conspirators would dumpsterdize, if you will, at the Washington Mutual Bank branch ..." and Siegelbaum "would use [that] customer profile information to create those false IDs. He was the leader of that. So as part of our plea the relevant conduct is much greater, a much greater amount than that particular charge."

The Presentence Report (PSR) was fully consistent with the plea agreement, recommending the same upward and downward adjustments the parties had contemplated in that plea agreement. The PSR also set forth the facts supporting those adjustments. The PSR was made available to Siegelbaum's counsel in advance of the sentencing hearing. No objections were lodged.

At sentencing, Siegelbaum did not contest any of the upward enhancements, or the factual allegations upon which those enhancements were premised, nor did he contest the sentence recommended by both the government and the PSR writer. The court imposed a sentence of 70 months in prison, to be followed by a 5–year term of supervised release, and restitution of $281,000—the very same sentence that Siegelbaum agreed to in his plea bargain. In return, the government dismissed the remaining 12 counts of the indictment that were against Siegelbaum.

Siegelbaum has suffered no injustice. He received the sentence for which he bargained. He did not contest the facts the court relied on in enhancing his sentence, nor was he harmed by application of a lesser standard of proof. Numerous charges against Siegelbaum were dismissed by the government, or foregone, in reliance upon his promise not to contest

the sentence enhancements. Siegelbaum is not entitled to relief.

### Conclusion

The motion (# 256) for post-conviction relief under 28 U.S.C. § 2255 is denied.