Mark Douglas **FIELDS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 64519.

Court of Criminal Appeals of Texas.

Feb. 3, 1982.

Rehearing Denied March 3, 1982.

Charles Perry, Paul Boudloche, on appeal only, Wichita Falls, for appellant.

Timothy D. Eyssen, Dist. Atty., Wichita Falls, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

This is an appeal from a conviction for capital murder as defined by V.T.C.A. Penal

Code, Sec. 19.03(a)(3). After finding the appellant guilty, the jury answered "yes" to the first two special issues submitted under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

The appellant was convicted of murdering Linda Brown, the estranged wife of Officer James Brown of the Wichita Falls Police Department, on April 18, 1975. The deceased died of a single gunshot wound. The proof showed that Officer Brown had hired the appellant to commit the murder for $400. The appellant does not challenge the sufficiency of the evidence.

The appellant was arrested on January 10, 1976. On May 10, 1976, jury selection began. On May 11, 1976, after three jurors had been selected, the trial court declared a mistrial over the appellant's objection.

On June 21, 1976, jury selection for the appellant's second trial began. This time a jury was successfully chosen. However, during the State's case-in-chief, one of the prosecutor's questions elicited testimony referring to an inadmissible oral statement made by the appellant. At that point, the appellant's counsel objected and asked the trial court to declare a mistrial. The court granted the request.

On January 18, 1977, a third trial began. This trial proceeded to a normal conclusion, and on January 21, 1977, the jury found the appellant guilty as charged. At the punishment stage of this trial the State's only evidence consisted of the testimony of Dr. Leon Morris, a psychologist, and Dr. Jack Tomlison, a psychiatrist.

Outside the presence of the jury Dr. Morris was questioned about any warnings he may have given the appellant concerning the psychological examination he was to do:

"Q Prior to the time that you did this evaluation, Mr. (sic) Morris, did you advise the Defendant that he didn't have to talk to you?

"A Did I advise him that he did not have to talk to me?

"Q Yes.

"A Yes. The first time that I saw him was April the 15th, 1976. I talked with him briefly. I did not examine him at that time. I left some paper tests for him to complete.

"Q Did you at any time tell him that he didn't have to talk with you, didn't have to discuss this with you?

"A I don't remember. I left the tests with him and the next day I went back, and he had not done them. He left me a note stating that—well, if you would like I can read it to you. It says, 'I don't mind doing the tests, but since I have been arrested I have been lied to many times. Therefore, I do not trust anything they come up with for me to do. I will have to talk to my lawyer about this first. I'm sorry. Mark Fields.' So, the testing was postponed. At this time, he had not done any of the tests.

"Q That was what date?

"A The day I picked the note up was April 16th, 1976, but before that, the day before that, April 15th, the day I left the tests I talked with Mr. John Martin of the district attorney's office, and I talked to Mr. Bailey, the Defendant's attorney, and I told both of them that I had been requested to do this examination, and I told them that if they had any information that might be relevant to this examination, I would be happy to consider it, so I did talk with the Defense attorney before doing any tests.

"Q Did you tell Mr. Fields at any time that he did not have to participate in the tests?

"A I believe I did. I don't know whether I told him that the first day or not, but I told him that later, if not the first time.

*     *     *     *     *     *

"Q Can you tell the Court whether or not you did at any time tell him, Mark Douglas Fields, that the result of any evaluations you might make of him could be used in evidence against him?

"A    I don't remember for sure whether I did or not.

"Q    You cannot say that you did?

"A    I cannot say that I did. I do remember discussing it with his attorney at the time.

"Q    Was he present?

"A    No.

\*    \*    \*    \*    \*    \*

"Q    And this examination and evaluation that you made of Mark Douglas Fields was done at the direction of the Court, is that correct?

"A    Yes, sir, Judge Kirk.

"Q    Did Mr. Fields ever request that you come and talk with him?

"A    No, he did not."

Upon the conclusion of this testimony, the appellant's attorney objected to allowing Dr. Morris to further testify. The basis of the objection was that the appellant had not been warned that he did not have to talk to Dr. Morris or participate in the tests, and that he had not been warned that the results of the tests could be used as evidence against him. The trial court overruled the objection.

When the jury was returned, Dr. Morris was then asked about the results of his tests:

"Q    Do you have a diagnostic impression of this Defendant?

"A    Yes, certainly, I do. His diagnosis was anti-social personality disorder.

"Q    Generally, can you tell us in lay terms what the anti-social personality disorder means?

"A    Generally speaking, it refers to a criminal kind of orientation. This individual has a very weak conscience or no conscience, and has poor impulse control, has inadequate regard for other people and his feelings are very shallow.

"MR. RICHIE: Your Honor, this is repetitious. He told us that once.

"THE COURT: Overruled.

"A    (Continuing) The person has little regard for society's rights and standards, he is very likely to encounter difficulty with rules and laws and very likely to be in trouble over and over and over.

\*    \*    \*    \*    \*    \*

"Q    Doctor, do you have an opinion as to whether or not this Defendant is likely to commit criminal acts of violence in the future that will constitute a continuing threat to society?

"A    I would say he is very likely to."

After Dr. Morris testified, Dr. Tomlison was questioned outside the presence of the jury:

"Q    Dr. Tomlison, did you, under the directions of the Court, see Mark Douglas Fields, the Defendant in this case?

"A    Yes, I did.

"Q    Do you recall when you first saw him?

"A    I saw him on June the 10th, 1976.

"Q    How many times thereafter?

"A    Just the one time.

"Q    All right, sir, did you, prior to the time—he was in the Wichita County jail at that time?

"A    He was in the Wichita County jail.

"Q    Prior to the time that you talked with him, did you advise him that he did not have to talk with you?

"A    No.

"Q    Did you advise him that the results of your examination could be used in evidence against him if he were tried for any offense?

"A    Not that I remember."

The appellant's attorney then made the same objection to Dr. Tomlison's testimony as he had made to that of Dr. Morris. It, too, was overruled.

Before the jury, Dr. Tomlison testified that, based upon his examination, he believed that the appellant had an "anti-social personality" pattern. After describing this personality pattern, the witness was asked:

"Q    Would an individual such as you have just described be likely to con-

tinue to come into contact with society illegally, in other words, they would have problem with organized society?

\* \* \* \* \* \*

"A  The question was, as I understand it, in my opinion would he continue to come into conflict with the law?

"Q  Yes.

"A  Yes, he would."

At the time of the examinations by Drs. Morris and Tomlison, the appellant was in custody. He had been indicted and was represented by an attorney. The appellant never raised the issues of his competence to stand trial or his sanity at the time of the offense. Although the record contains no written order by the trial court, both doctors testified that their examinations were at the direction of the court. Dr. Morris further testified that he had been instructed to determine whether the appellant was competent to stand trial.

█  The record fails to reflect that the appellant was advised before the examinations that he had a right to remain silent and that any statement he made could be used against him at the punishment phase of his trial.

We hold that the admission of the testimony of Drs. Morris and Tomlison violated the appellant's right against self-incrimination as guarantied by the Fifth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. 10 of the Texas Constitution. The erroneous admission of this testimony requires a reversal of the appellant's conviction. See *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Clark v. State*, 627 S.W.2d 693 (Tex.Cr.App.1981).

In nine grounds of error, the appellant also contends that there was error in the guilt-innocence stage of his trial. We find it necessary to address only five of those grounds.

█  In two grounds of error, the appellant contends that his confession is inadmis-sible because his arrest was based on less than probable cause. These grounds of error attack the sufficiency of the affidavit filed in support of the request for an arrest warrant. Although the appellant raised this contention before trial and presented evidence at a pre-trial hearing, he failed to introduce into evidence either the arrest warrant or the affidavit. Our search of the record in this case did not reveal either document. The appellant did not request that either document be included in the appellate record. For these reasons, nothing is presented for review.

█  In one ground of error, the appellant contends that his confession is inadmissible because it was induced by promises. The only evidence of any promise was the testimony of the appellant's wife that the district attorney told her that the appellant did not need an attorney because he would be given immunity from prosecution if he testified against his co-defendants. Even if we concluded that such a promise would have rendered the appellant's confession inadmissible, there was no testimony that this promise, if any, was made to the defendant. The trial court's finding that the appellant's confession was not induced by any promises is supported by the record. The ground of error is overruled.

In two grounds of error, the appellant contends that the trial court erred in overruling his motion for change of venue. On June 15, 1976, before the jury was chosen for the appellant's second trial, the appellant filed a motion for change of venue. The motion was properly supported by affidavits of two residents of Wichita County as required by V.A.C.C.P., Art. 31.03. The next day the appellant filed another pre-trial motion. One paragraph of that motion asked that his venue motion be carried along with the voir dire of the jury. On June 23, 1976, after the jury had been chosen, but before the trial began, the trial court overruled the motion for change of venue. At no time did the State file controverting affidavits under V.A.C.C.P., Art. 31.04. Although the record in this case is confused, it does not appear that the trial

court ever held a hearing on the venue motion.

As noted earlier, the appellant's second trial ended with the declaration of a mistrial. On November 9, 1976, before the appellant's third trial began, he once again filed a properly supported motion for change of venue. The record does not reflect that this motion was controverted by the State, nor does it reflect that the trial court held a hearing on this motion or specifically ruled upon it. However, the record does include an order by the trial court that "all the prior Motions asserted in the prior trials of this cause be herein incorporated by reference and the rulings thereon remain the same for purposes of this the third trial of this cause."

As we view the case then, this order by the trial court before the appellant's third trial had the effect of reaffirming the court's previous ruling which overruled the appellant's motion for change of venue without a hearing to take evidence and without controverting affidavits by the State. This was reversible error.

It has long been the rule in this state that a defendant is entitled to a change of venue as a matter of law when a properly supported motion is not contested by the State in the form of either controverting affidavits or by evidence presented at a hearing on the motion. *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1979); *Hussey v. State*, 590 S.W.2d 505 (Tex.Cr. App.1979); *Stapleton v. State*, 565 S.W.2d 532 (Tex.Cr.App.1978); *Durrough v. State*, 562 S.W.2d 488 (Tex.Cr.App.1978).

The State argues that the appellant waived his right to pursue this ground of error because he asked the trial court to carry the venue motion along with the voir dire of the jury. This argument misconceives the appellant's contention. The appellant does not complain on appeal that the trial court erred in ruling on his motion after the jury was chosen, but before the trial began. Rather, he contends that as a matter of law his motion should have been granted because the State never controvert-

ed the motion. Thus, the issue before us is not the timeliness of the trial court's ruling, but the merits of the ruling.

Although the appellant's motion asking the trial court to carry the venue motion along with the voir dire of the jury may have been a waiver of his right to have the motion granted before selection of the jury, a question not before us in this appeal, it was *not* a waiver of his right to have the motion granted absent controverting evidence by the State. Furthermore, the selection of an unbiased jury is insufficient to satisfy the State's burden to join issue with a motion for change of venue. See *O'Brient v. State*, 588 S.W.2d 940 (Tex.Cr. App.1979); *Henley v. State*, 576 S.W.2d 66 (Tex.Cr.App.1978). As we stated in *Henley*,

> "Appellant was entitled to a change of venue if he could show, even though it would be possible to select a jury whose members were not subject to a challenge for cause, that there were influences in the community which could affect the answers on voir dire, or the testimony of witnesses at trial or that for any other reason a fair and impartial trial could not be had. . . ."

576 S.W.2d at 72.

The appellant's motion for change of venue properly put in issue the possible prejudice existing in Wichita County which could prevent him from obtaining a fair and impartial trial. The lack of any controverting evidence by the State entitled the appellant to a change of venue as a matter of law. For this reason, the trial court abused its discretion in overruling the motion.

As stated above, the appellant presents four other grounds of error which raise contentions dealing with the guilt-innocence stage of his trial. Because these grounds of error attack matters which are not likely to recur in the event of a new trial, we do not address these grounds.

Having determined that this conviction must be reversed, we must next determine whether the State may retry the appellant if it chooses. In three grounds of error, the appellant contends that the trial court erred in overruling his plea of former jeopardy,

and in not submitting that plea to the jury. If we agreed with the appellant a retrial, of course, would be barred. However, we do not agree with the appellant's contentions.

■ First, the appellant argues that his first trial was improperly terminated, and that, therefore, both his second and third trials were barred. See Art. 1.10; Art. 27.05, V.A.C.C.P. The flaw in this argument is that when his first trial ended he had not yet been placed in jeopardy.

In *McElwee v. State*, 589 S.W.2d 455 (Tex.Cr.App.1979), we held that in a criminal prosecution, jeopardy attaches when the jury is impaneled and sworn. See also *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). At the time the trial court declared a mistrial during the appellant's first proceeding, only three potential jurors had been chosen and none of these had been sworn in as a juror. No jeopardy had yet attached.

In support of this contention the appellant cites *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *United States v. Kin Ping Cheung*, 485 F.2d 689 (5th Cir. 1973); and *McLelland v. State*, 420 S.W.2d 417 (Tex.Cr.App.1967). We find none of these cases to be on point. In each a mistrial was declared without the defendant's consent, but in each the trial was ended during the presentation of evidence. In none of these cases was the trial ended before the jury was impaneled.

Second, the appellant argues that the mistrial declared during his second trial should have barred his third trial. In his second trial a number of witnesses had testified for the State. The State then called Sgt. James Shelton of the Wichita Falls Police Department. During redirect examination the following occurred:

"Q  Sgt. Shelton, in response to Mr. Bailey's question about being at 2602 Hairpin, have you ever been out there other than the night—than the time you went out to arrest James Brown?

"A  On the premises?

"Q  Uh huh.

"A  No, sir, not on the premises. We had driven by it.

"Q  Had you been in the area?

"A  Yes, sir, we had been in the area.

"Q  Who were you with at that time?

"A  I don't remember exactly; Mr. Fields was in the car with us.

"Q  Why were you all out there?

"A  In reference to his statement that he had given. We were trying to verify some information concerning where he had stood at the time the murder had been committed.

"MR. ESTRADA: Your Honor—

"THE COURT: Sustain the objection. The jury is instructed not to consider the question or the answer.

"MR. ESTRADA: We move for a mistrial, your Honor.

"THE COURT: Let me think about that. You all go inside the jury room a minute."

The court then granted the mistrial. He explained to the jury that the statement to which Sgt. Shelton referred was an inadmissible oral statement and that the law was "very explicit."

■ Where the circumstances which cause a mistrial are not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to be no bar to reprosecution. This is so even when the motion is required by prosecutorial or judicial error. See *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *Chvojka v. State*, 582 S.W.2d 828 (Tex.Cr.App.1979).

However, the Double Jeopardy Clause does protect a defendant from bad faith conduct by a judge or prosecutor which is intended to provoke a mistrial request. See *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963).

■ The appellant seeks to characterize the questioning of Sgt. Shelton, set out

above, as prosecutorial overreaching. We find no evidence to support such a characterization. It was error for the prosecutor to elicit testimony which revealed the existence of the appellant's oral statement, but more than error is required to show overreaching. The appellant has demonstrated neither intentional misconduct nor gross negligence on the part of the prosecutor. We, therefore, do not find that the prosecutor's questioning was intended to provoke a mistrial request.

For these reasons, we hold that the appellant's plea of former jeopardy was properly overruled by the trial court as a matter of law. It follows, then, that the court did not err in refusing to submit the issue to the jury. No fact issues were presented for the jury's resolution.

▌The appellant makes another contention which we must answer. He contends that his right to a speedy trial as guarantied by the Sixth Amendment to the United States Constitution was violated when his third trial was held some seven months after the second mistrial was declared, and just over one year after his arrest.[1]

In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court emphasized that the Constitution does not require the State to try a defendant within a specific time period. Rather, the determination of whether a defendant's right to a speedy trial has been denied depends upon a balancing of four factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

In this case, the appellant was arrested on January 10, 1976. He was indicted on January 30, and had counsel appointed to represent him on February 2. After a change of counsel on February 9, several pre-trial motions were filed beginning March 5. These motions were heard and

ruled upon April 22. The appellant's first trial then began on May 10, 1976. As previously stated, this trial ended during the jury voir dire on May 11.

Prior to his second trial, the appellant's counsel filed several new motions beginning May 14. These motions were heard and ruled upon just before the second trial began on June 24, 1976. After this trial also ended in a mistrial, counsel for the appellant again filed several new pre-trial motions. On September 20, 1976, co-counsel Dale Bailey, who had represented the appellant since February 9, asked for, and was granted, permission to withdraw as counsel. Remaining co-counsel filed several new motions in November, 1976. These motions were ruled upon on November 12.

Finally, on January 18, 1977, the appellant's third trial began. Not until the day before this trial, on January 17, did the appellant file his motion requesting dismissal of the case for failure to provide him a speedy trial.

Under the circumstances of the case we find no denial of the appellant's Sixth Amendment right to a speedy trial. Although this case was not tried until just over a year after the appellant was arrested, the record reflects that it was at all times an active case. There were numerous pre-trial motions filed before each of the three trials. These were timely ruled upon. In addition, the appellant had several changes of counsel during this one-year period.[2]

We, therefore, do not find either the total period of time between the appellant's arrest and his third trial, or the period of time between his second and third trials, to be excessive in view of the reasons for the delay. We note that the appellant did not assert his right to a speedy trial until the day before his third trial. In addition, we note that the appellant has not alleged that he was prejudiced by the delay.

---

1. The appellant does not claim that there was a violation of his right to a speedy trial under state law. See Art. 32A.02, V.A.C.C.P.

2. Although the record does not reflect when the change took place, we note that trial counsel during the appellant's third trial was different from any of the attorneys who had filed the various pre-trial motions.

For these reasons we hold that the appellant has not been denied his right to a speedy trial as guarantied by the Sixth Amendment to the United States Constitution.

Because the trial court erred in overruling the appellant's motion for change of venue, and erred in admitting the testimony of Drs. Morris and Tomlison at the punishment stage of the appellant's trial, we reverse this judgment of conviction and remand for a new trial.

McCORMICK, Judge, concurring.

In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a Texas capital murder defendant was examined by a psychiatrist who had been ordered by the trial court to evaluate the defendant's competency to stand trial. At the time of the examination, the defendant had been indicted and an attorney had been appointed for him. Before the psychiatric examination, the defendant was not informed he had a right to remain silent nor that evidence obtained during the examination could be used against him in the punishment phase of his trial. His attorney apparently was not notified in advance that the examination would encompass the issue of future dangerousness.

In reaching its holding in *Estelle v. Smith*, the Supreme Court discounted arguments by the State of Texas that the Fifth Amendment is applicable only to the guilt-innocence phase of the trial and not the punishment determination. Likewise, the Court was not persuaded that the conclusions drawn from the interview were based on nontestimonial factors. The Court showed that the psychiatrist based his opinions on the content of ideas expressed by the defendant. The Supreme Court, therefore, held that the Fifth Amendment privilege was involved in the case before it.

The United States Supreme Court concluded that the defendant's Fifth Amendment rights were violated because of the failure to warn the defendant of his right to be silent and the possibility that evidence gathered in the interview could be used against him at the hearing on punishment. The Supreme Court said:

"... That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a post-arrest custodial setting. During the psychiatric evaluation, respondent assuredly was 'faced with a phase of the adversary system' and was 'not in the presence of [a] person[ ] acting solely in his interest.' Id. [384 U.S.] at 469, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 Ohio Misc. 9, 36 Ohio Ops.2d 237, 10 ALR3d 974. Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him." 454 U.S. at 467, 101 S.Ct. at 1875.

The Supreme Court therefore concluded:

"A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson [psychiatrist] to establish his future dangerousness." 454 U.S. at 468, 101 S.Ct. at 1876.

The Supreme Court also held that failure to notify defense counsel prior to the examination that the psychiatric examination

would lead to an opinion on future dangerousness violated the defendant's Sixth Amendment right to counsel because the psychiatric interview was a critical stage of the proceedings. The Supreme Court did not hold that counsel had a right to be present during the examination but did hold that notification is important so that a determination can be made by the attorney and defendant as to whether or not to participate in the examination.

Thus, the Supreme Court overruled a number of decisions of this Court. See *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr. App.1976), cert. denied 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977), cert. denied 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978), cert. denied 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979); *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979), and *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976), cert. denied 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977).

The threshold question that must be decided is whether *Estelle v. Smith*, supra, is retroactive in its effect or whether the holdings enunciated in that case should be applied only prospectively. The majority fails to discuss this issue.

*Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), held that the Constitution neither prohibits nor requires retroactive effect for decisions expounding new constitutional rules affecting criminal trials. Therefore, a constitutional rule may be applied prospectively and not to cases occurring before the rule was announced.

Recently, in *Brown v. Louisiana*, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980), the Supreme Court discussed the principles of retroactivity. The Court held that three factors should be considered: (1) purpose of the new rule; (2) extent of reliance by law enforcement on the old rule, and (3) the effect on the administration of justice of retroactivity. The most important and controlling factor is the purpose of the new rule. The other two factors become important *only* when the purpose does not favor either prospectivity or retroactivity. As for the purpose criteria, the Supreme Court said, "And only when an assessment of those probabilities casts doubt upon the reliability of the determinations of guilt in past criminal cases must the new procedural rule be applied retroactively." 447 U.S., at page 329, 100 S.Ct., at page 2220. Therefore, when a new rule is announced, it must be applied retroactively only if the procedure used casts doubt upon the fairness of the trial or the efficacy of the truth finding procedure. In *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 338 (1971), the Supreme Court said that retroactivity is only appropriate where the former practice "presents substantial likelihood that the results of a number of those trials were factually incorrect." 401 U.S., at 655, 91 S.Ct., at 1153.

I would note in passing, though it is certainly not of controlling importance, that for years law enforcement officials relying on this Court's holdings have followed the procedures set out in *Estelle v. Smith*, supra. Numerous defendants in this State alone have been convicted via the procedure outlined in that case. These capital murder trials often lasted for weeks, if not months, and retrials in all of these cases would certainly burden the administration of justice in this State and others. See also *State v. Osborne*, 102 Idaho 405, 631 P.2d 187, 218 (1981).

Both holdings in *Estelle v. Smith* changed the law in Texas. This Court had for years rejected claims on these bases. Never before had it been held that a court-appointed mental health expert must warn a defendant of his right to remain silent and that evidence adduced in the psychiatric interview could be used against him. Never before had it been held that the defendant attorney must receive notice before a psychiatric interview on the dangerousness issue could be held. In fact, in numerous cases this Court rejected the contentions that the proceedings used in *Estelle v. Smith* violated a defendant's rights. See

*Livingston v. State,* supra; *Shippy v. State,* supra; *Von Byrd v. State,* supra; *Wilder v. State,* supra, and *Gholson v. State,* supra. In fact, the United States Supreme Court had denied certiorari in many of those cases. Until the United States District Court decision in *Smith v. Estelle,* 445 F.2d 647 (N.D.Tex.1977), there had been no contrary judicial voice in Texas. That the rule in *Estelle v. Smith* was a new rule was explicitly recognized by the federal courts as a factor in excusing the defendant from the contemporaneous objection rule. The United States Supreme Court in a footnote said, "For the reasons stated by the Court of Appeals we reject the State's argument that the respondent waived his Fifth Amendment claim by failing to make a timely, specific objection to Dr. Grigson's testimony." The Fifth Circuit had said, in part, ". . . Texas courts interpreted the Fifth and Sixth Amendments to permit testimony like Dr. Grigson's to be admitted, see e.g., *Livingston v. State,* 542 S.W.2d 655, 661–662 (1976), cert. denied 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977), we have held that the apparent futility of objecting to an alleged constitutional violation excuses a failure to object." *Smith v. Estelle,* 602 F.2d 694 (5th Cir. 1979), at 708. Certainly, if the defendant could not have anticipated the new rule, neither could the State.

In *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Supreme Court held administrative search warrants were needed for unconsented OSHA inspections. That ruling was held not to be retroactive in *Savina Home Industries v. Secretary of Labor,* 594 F.2d 1358 (10th Cir. 1979), since ". . . the clearest lower court pronouncement regarding Section 8(a)'s constitutionality had been that warrantless OSHA inspections were not violative of the Fourth Amendment", 594 F.2d at 1364.

This Court, the highest criminal court in this State, had sanctioned the type procedure condemned in *Estelle v. Smith,* supra. I am not unmindful of the recent opinion in *Battie v. Estelle,* 655 F.2d 692 (5th Cir. 1981). In that opinion the Fifth Circuit found that *Estelle v. Smith* was retroactive as related to the Fifth Amendment issue. *Battie* did not address the Sixth Amendment question. However, this Court is not bound by decisions of federal courts other than the Supreme Court, *Pruett v. State,* 463 S.W.2d 191 (Tex.Cr.App.1970), and upon consideration, I am compelled to disagree with the conclusion reached in *Battie.*

In *Battie,* the federal court found that *Estelle v. Smith* announced no new rule of law. The opinion said essentially that *Estelle v. Smith* was an application and extension of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Fifth Circuit said, "A decision establishes a new principle of law either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." After so saying, the Fifth Circuit proceeded to ignore completely the fact, and omitted mention, that state case after state case had upheld the procedure used in *Estelle v. Smith.* It was on that clear past precedent that the litigants had relied. That this Court was in error in its interpretation of the Constitution is now without question. However, the litigants were certainly entitled to rely upon the decision of the highest court in this State until the federal courts found differently.

In *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), the Supreme Court held that the constitutional rule announced in *Almeida-Sanchez,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), would not be applied retroactively. The Court held that despite the fact that *Almeida-Sanchez* applied familiar principles of constitutional law almost fifty years old and that the Supreme Court had never ruled on the fact situation issue before, the law enforcement agents were relying on apparently valid statutes and lower court decisions.

The Supreme Court said:

"It was in reliance upon a validly enacted statute, supported by long standing administrative regulations and continu-

ous judicial approval, that Border Patrol agents stopped and searched respondent's automobile. Since the parties acknowledge that *Almeida-Sanchez* was the first roving border patrol case to be decided by this Court, unless we are to hold that parties may not rely upon any legal pronouncements from sources other than this Court, we cannot regard as blameworthy those parties who conform to the prevailing statutory or constitutional norm." 422 U.S., at 541–542, 95 S.Ct., at 2319.

It should be noted that in this case as in *United States v. Peltier*, supra; *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the question concerns the retroactivity of a rule affecting the admissibility of evidence offered by a litigant rather than a procedure used in the trial as in *Brown v. Louisiana*, supra, or *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977).

While I do not believe that the Fifth Amendment holding in *Estelle v. Smith* was merely an inevitable extension of *Miranda* nor that it had been "clearly foreshadowed", a holding can be a new rule of law and yet have been foreshadowed by a prior case. See, for example, *Brown v. Louisiana*, supra. In *Burch v. Louisiana*, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979), the Supreme Court held that a conviction by a nonunanimous six person jury violates a defendant's Sixth and Fourteenth Amendment rights. That holding had been distinctly foreshadowed in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and *Ballew v. Georgia*, 435 U.S. 231, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978).

However, in *Brown v. Louisiana*, supra, the Supreme Court addressed the issue of retroactivity rather than holding at the threshold that there was no new rule involved. The test for determining if there is a new rule is whether the decision changed the prevailing law. Whether a holding has been foreshadowed is a factor to be considered if the purpose of the rule does not clearly favor retroactivity or prospectivity.

See also *Woodard v. United States*, 429 F.2d 716 (D.C.Cir.1970), which discusses why whether a new rule has been "foreshadowed" should not be determinative of retroactivity.

That *Miranda* did not inevitably and mechanically compel *Estelle v. Smith* can be seen in Berry, *Self Incrimination and the Compulsory Mental Examination: A Proposal*, 15 Ariz.L.Rev. 919 (1973), cited in *Battie*. There, Berry says, ". . . when a writer concludes that, because the psychiatric examination occurs while the defendant is in custody and is conducted by state-employed doctors, the protections of *Miranda v. Arizona* should apply, he is evading the challenge of legal analysis. The differences between the mental examination and custodial interrogation are no less important than the similarities." In light of all the foregoing, I find that *Estelle v. Smith* did change the law in Texas. It is, therefore, necessary to determine the purpose of the holding in *Estelle v. Smith* and whether the procedure used adversely affected the search for truth. Initially, I shall consider the requirement that a defendant be warned before the interview that he need not submit to the interview and that anything he says may be used against him.

In an opinion by Chief Justice Warren in *Johnson v. New Jersey*, supra, the United States Supreme Court held that its decision in *Miranda v. Arizona*, supra, requiring that warnings be given a defendant when he is questioned by the police, is not retroactive.

In *Johnson*, co-defendants Johnson and Cassidy, both of whom faced death sentences, claimed that their Fifth and Sixth Amendment rights were violated. Cassidy was arrested at 4:00 a. m. for murder and interrogated for hours. At 10:25 a. m., he gave a partial confession. He was interrogated more. After noon, he gave a more incriminating confession. By 11:40 p. m., he gave a final confession. It was accepted that he had requested and been denied the right to consult with an attorney before confessing. Prior to confessing, he was not given *Miranda* type warnings.

Johnson was arrested at 5:00 p. m. for the same crime. He was routinely questioned and taken briefly before a magistrate. At 2:00 a. m. he was taken to the homicide scene. After continued interrogation he gave a confession at 6:20 a. m. It was accepted that he had requested and been denied an attorney. Prior to confession he was not given *Miranda* warnings. The Supreme Court said, "We here stress that the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved.... To reiterate ... we do not disparage a constitutional guarantee in any manner by declining to apply it retroactively." 384 U.S., at 728, 86 S.Ct., at 1778. The Supreme Court added:

"Finally, we emphasize that the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree. We gave retroactive effect to *Jackson v. Denno*, [378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 904 (1964)] supra, because confessions are likely to be highly persuasive with a jury, and if coerced they may well be untrustworthy by their very nature. On the other hand, we denied retroactive application to *Griffin v. California* [380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)] supra, despite the fact that comment on the failure to testify may sometimes mislead the jury concerning the reasons why the defendant has refused to take the witness stand. We are thus concerned with a question of probabilities and must take account, among other factors, of the extent to which other safeguards are available to protect the integrity of the truth-determining process at trial." 384 U.S., at 728–729, 86 S.Ct., at 1778.

The Supreme Court in *Johnson*, therefore, held that the *Miranda* requirement that a defendant must receive warnings before being interrogated by police would not be retroactive and affirmed the convictions. *Johnson* also addressed the retroactivity of *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), discussed below.

If the rule that police officers must warn a suspect of his rights prior to questioning is not subject to retroactive application, I can see no reason to require that the new rule that a court-appointed psychiatrist must give warnings prior to a psychiatric interview be retroactive. In *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), the Supreme Court held that *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), was not to be applied retroactively. In *Tehan*, the defendant did not testify. The prosecutor, in argument, commented extensively upon this failure. The Supreme Court refused to overturn the conviction and apply *Griffin* retroactively, saying, "... the Fifth Amendment's privilege against self incrimination is not an adjunct to the ascertainment of truth. That privilege ... stands as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone." 382 U.S., at 416, 86 S.Ct., at 465.

I am unable to see how the failure of a mental health expert to give the proper warnings might significantly mislead a jury or cause incorrect information to be available to the jury. The method used in obtaining the information may now be unconstitutional, but there is nothing casting doubt upon its reliability. Therefore, I would hold that the requirement set forth in *Estelle v. Smith*, supra, that a defendant be warned that he need not submit to the interview with the mental health expert and that the information garnered as a result of such an interview may be used against him, is not a retroactive requirement.

I now turn to whether the Sixth Amendment holding set out in *Estelle v. Smith* that a defendant be given prior opportunity to consult with his attorney about his participation in a psychiatric examination for a determination of dangerousness is retroactive.

In *Escobedo v. Illinois*, supra, a defendant was arrested for murder. His attorney

went to the police station and made numerous requests to speak with his client. His requests were denied. The defendant meanwhile was also making repeated efforts to consult with his attorney. These requests were likewise denied. After he was not allowed to speak with his attorney, Escobedo made an inculpatory statement that was admitted in his trial. The Supreme Court, using the "guiding hand of counsel" language that is found in *Estelle v. Smith*, held that counsel had been denied at a critical stage of the proceedings, thereby leading to the inculpatory statement and found that the Sixth Amendment had been violated.

However, in *Johnson v. New Jersey*, supra, the United States Supreme Court decided that the holding in *Escobedo* was not retroactive.

In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), a defendant participated in a lineup. The lineup was conducted after indictment and after counsel was appointed. Defense counsel was not notified prior to his client's participation in the lineup. Once more, citing the need for the "guiding hand of counsel", the Supreme Court found that the lack of notice to counsel violated the defendant's Sixth Amendment right to effective assistance of counsel and reversed the conviction.

In *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court affirmed a death sentence and specifically held that the rule in *Wade* would not be applied retroactively but would be applied only prospectively. See also, *Adams v. Illinois*, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972).

The danger of unfairness in a *Wade*-type lineup is certainly much greater than that presented here since the attorney has a right to be present at the lineup to guard against any unfairness in the procedure whereas he has no right to be present at the psychiatric interview. In fact, it is much less likely that a psychiatric interview will be unfair or unreliable compared to a lineup of suspects conducted by the police. I am not convinced that the lack of notice to the attorney in this type case casts any doubt on the fact-finding proceeding. As the Supreme Court in *Estelle v. Smith* noted, the purpose of the notice in examination cases is to allow an informed decision as to whether to participate, and not to guard against unfairness. It is true that, if his attorney had been notified prior to the interview, the appellant may not have participated, but it is also true that, if Johnson's attorney had conferred with Johnson, Johnson may not have confessed. It is not a question of whether the evidence used would not have been adduced, but rather whether the trial and evidence introduced were unreliable that is important in determining retroactivity. Nowhere in *Estelle v. Smith* does the Supreme Court express any reservation as to the *accuracy* of the procedure used there. Compare, *Brown v. Louisiana*, supra. I find nothing that would indicate unreliability and nothing that would mislead the finder of fact. In *United States v. Peltier*, supra, the majority of the Supreme Court noted that, in every case in which relevant evidence was excluded to enforce a constitutional guarantee not related to the fact-finding process, such principles have been applied only prospectively.

Therefore, I would find that the principles of constitutional law set forth in *Estelle v. Smith* are not retroactive. *Estelle v. Smith* was announced May 18, 1981. The district court decision in *Smith v. Estelle* was announced December 30, 1977. The interview here in question and the trial occurred before either. Therefore, since *Estelle v. Smith* should not be applied retroactively, I would not reverse appellant's conviction on that ground.