**Eugene Keith SULIE, Petitioner–Appellant,**

v.

**Jack DUCKWORTH and Indiana Attorney General, Respondents–Appellees.**

No. 87–1321.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1987.

Decided Dec. 22, 1988.

Rehearing and Rehearing En Banc Denied Jan. 31, 1989.

Robert S. Markin, Jenner & Block, Chicago, Ill., for petitioner-appellant.

David A. Nowak, Asst. Atty. Gen., David L. Steiner, Indianapolis, Ind., for respondents-appellees.

Before BAUER, Chief Judge, and COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Petitioner, Eugene Sulie, asks us to review the district court's order dismissing his petition for a writ of habeas corpus. The district court dismissed Sulie's petition after finding that the issues raised in the petition were identical to those raised in a prior petition already considered and rejected by both the district court and this court. Concluding that Sulie had not supplement-

ed his second petition for habeas relief with a colorable claim of factual innocence, as required under *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the district court dismissed Sulie's petition.

We find that the decision in *Kuhlmann* does not bar Sulie's successive petition for habeas relief. But, because we also find that the alleged evidentiary error, about which Sulie complains, is harmless beyond a reasonable doubt, his petition for habeas relief must be denied on its merits.

### I.

In December 1976, an Indiana state court convicted Eugene Sulie of first degree murder. At trial, Sulie presented an insanity defense. Under Indiana law then in effect, the state had the burden of proving Sulie sane beyond a reasonable doubt. As part of its evidence, the state presented the testimony of two doctors. The doctors testified that despite Sulie's previous eighteen-year incarceration in a mental institution and his recurring symptoms of paranoid schizophrenia, Sulie was sane at the time of the murder. In an effort to prove that Sulie had the ability to understand and reason, the state also elicited testimony from the arresting officer that Sulie had asked for an attorney after being given his *Miranda* warnings. Only one question and answer relating to this area of inquiry were made:

PROSECUTOR: Did he ask to contact an attorney?

OFFICER: Yes.

It is this single one-word answer, to which no further reference was made during trial, that ultimately led to Sulie's successive petitions for a writ of habeas corpus and this appeal.

Following his conviction and life sentence, Sulie appealed to the Indiana Supreme Court arguing that the introduction into evidence and use of his post-*Miranda* request for an attorney violated his constitutional rights. In *Sulie v. State,* 269 Ind.

204, 379 N.E.2d 455 (1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979), a divided court affirmed Sulie's conviction. The majority ruled:

> The defendant now argues that the request for an attorney is similar to silence in response to the *Miranda* warnings and that this burdened his constitutional rights. While it is true that silence in response to the *Miranda* warnings may not be shown and such silence may not be used to impeach the defendant's testimony, *United States v. Hale* (1975) 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99, the defendant has cited no *authority for his novel proposition that a request for an attorney is similar to silence.*

379 N.E.2d at 456 (emphasis added).

The dissent however, was less convinced that Sulie had no authority for the proposition that a post-*Miranda* request for an attorney was equivalent to post-*Miranda* silence. Relying on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the dissent reasoned that the holding in *Doyle,* which prohibits the prosecutor from using a defendant's post-*Miranda*-warnings silence to prove guilt, applies with "equal, if not greater, force to a suspect's request for an attorney. Revelation of such a request to the jury is a bald invitation to infer that the suspect is acknowledging his guilt." 379 N.E.2d at 458. The dissent concluded that the admission of the officer's testimony constituted error.[1]

Following the denial of his petition for a writ of certiorari filed with the United States Supreme Court, Sulie filed his first petition for a writ of habeas corpus in the United States district court. He argued only that his post-*Miranda* request for an attorney should not have been admitted and that the admission of this testimony constituted reversible error.

Like the Indiana Supreme Court, the district court found that Sulie's request for an attorney was relevant to the issue of his sanity. Moreover, the court found that

---

**1.** The dissent did not address the issue of whether the error was harmless in light of all the   other evidence introduced at trial.

unlike post-*Miranda* silence, a post-*Miranda* request for an attorney was not susceptible to an interpretation of an admission of guilt. The district court therefore concluded that *Doyle v. Ohio* did not bar the introduction and use of the disputed evidence. Alternatively, the district court ruled that the admission of the arresting officer's testimony was harmless error since the evidence of Sulie's guilt and sanity was so overwhelming that the introduction of the questionable evidence was harmless beyond a reasonable doubt.

Sulie appealed the district court's order denying his first petition for habeas relief. In 1982, this court affirmed the district court's finding that *Doyle* did not prohibit the introduction of a post-*Miranda* request for an attorney as proof of Sulie's sanity. However, we noted:

> The question whether it is a violation of a criminal defendant's constitutional rights to testify that he asked to speak to a lawyer ... was addressed in *Jacks v. Duckworth*, 651 F.2d 480, 482–83 (7th Cir.1981), and this court held it was not. But the court's opinion lays heavy emphasis on the harmlessness of the alleged error in the circumstances of *that case, and we are less certain that if there was an error here it was harmless.*

*Sulie v. Duckworth*, 689 F.2d 128, 129 (7th Cir.1982), *cert. denied*, 460 U.S. 1043, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983) (emphasis added).

Judge Cudahy dissented, and relying on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), stated that "just as the *Miranda* warnings implicitly assure an accused that exercise of the announced right to silence will carry no penalty, so too must they implicitly give assurance that a defendant's exercise of the announced right to counsel will carry no penalty." *Sulie*, 689 F.2d at 132. After this court's decision, Sulie again petitioned the Supreme Court for a writ of certiorari, which was again denied.

Three years later, in *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the Supreme Court extended its ruling in *Doyle* to the situation where a defendant's post-*Miranda* silence is used to overcome his insanity defense. The Court said:

> The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity.

474 U.S. at 292, 106 S.Ct. at 639. The Court also said: "[W]e point out that silence does not mean only muteness; it includes the statement of a desire to remain silent until an attorney has been consulted." 474 U.S. at 295 n. 13, 106 S.Ct. at 641 n. 13.

Thus, *Greenfield* addressed the very issue raised in Sulie's first petition for a writ of habeas corpus. Indeed, the Supreme Court implied that it granted certiorari in *Greenfield* because the Eleventh Circuit Court of Appeals' opinion, which granted Greenfield's petition for habeas relief, directly conflicted with this court's earlier decision in this case. 474 U.S. at 289 n. 4, 106 S.Ct. at 637 n. 4.

Not unexpectedly, shortly after *Greenfield* was decided, Sulie filed the present petition for a writ of habeas corpus, raising the exact same claim raised in his first petition—namely that his post-*Miranda* request for an attorney should not have been used against him and that such use constituted reversible error.

Relying on another recent Supreme Court decision, *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the district court dismissed Sulie's second petition, finding Sulie had failed to support his constitutional claim with a colorable showing of factual innocence, a prerequisite to filing successive and identical petitions for habeas corpus.

This appeal followed.

## II.

Initially, we must decide whether the requirements for successive petitions for ha-

beas relief have been met. We must then determine whether the Supreme Court's decision in *Greenfield* should be retroactively applied to Sulie's case.

In *Kuhlmann,* the Supreme Court reviewed the evolution of the "Great Writ." The Court noted that Congress evinced a strong interest in according a judgment, denying a petition for a writ of habeas corpus on its merits, a binding effect. Thus, where a petitioner filed successive petitions for habeas corpus, which contained identical claims, the courts were required to balance the "interest of the prisoner in relitigating constitutional claims held meritless on a prior petition" with the "countervailing interests served by according finality to the prior judgment." 477 U.S. at 452, 106 S.Ct. at 2626. Only in rare instances where the "ends of justice" would be served by doing so was reconsideration of a successive petition for habeas corpus warranted.

When the "ends of justice" would be served by reconsidering previously decided issues was originally addressed in *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).[2] Although the Court declined to define precisely the term "ends of justice" in *Sanders,* it did provide two examples of when a hearing on an identical, successive habeas petition might be appropriate.

> If factual issues are involved, the applicant is entitled to a new hearing upon showing that the evidentiary hearing on the prior application was not full and fair....
>
> If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application.

373 U.S. at 17, 83 S.Ct. at 1078.

Despite the Supreme Court's reluctance in *Sanders* to narrowly define "ends of justice," a plurality of the *Kuhlmann* Court said:

> [A]s a means of identifying the rare case in which federal courts should exercise their discretion to hear a successive petition, we continue to rely on the reference in *Sanders* to the "ends of justice." Our task is to provide a definition of the "ends of justice" that will accommodate Congress' intent to give finality to federal habeas judgments....

477 U.S. at 451, 106 S.Ct. at 2626.

Without drawing any distinctions between a habeas petition seeking relief on factual versus legal grounds, the plurality concluded that:

> a prisoner retains a powerful and legitimate interest in obtaining his release from custody *if he is innocent....* That interest does not extend, however, to prisoners whose guilt is conceded or plain.

477 U.S. at 452, 106 S.Ct. at 2626 (emphasis added). Thus, the plurality ruled that the "ends of justice" require that successive petitions for habeas relief be entertained *only* where "the prisoner supplements his constitutional claim with a colorable showing of factual innocence." 477 U.S. at 454, 106 S.Ct. at 2627.

In dismissing Sulie's second petition for habeas corpus, the district court relied on the plurality's new rule, finding that Sulie had made no colorable claim of innocence. On appeal, Sulie argues that the district court's reliance on *Kuhlmann* is misplaced since the portion of the opinion upon which the district court relied was only a plurality opinion.

Indeed, two justices, Justice White and Justice Blackmun, joined only parts of the plurality opinion,[3] declining to join in the section discussing the need to redefine "ends of justice" or the section requiring the petitioner to supplement his second pe-

---

**2.** *Sanders* involved successive petitions for habeas relief filed by federal prisoners. Nevertheless, the "ends of justice" test applies to successive petitions filed by state prisoners as well. *Kuhlmann,* 477 U.S. at 448, 106 S.Ct. at 2624.

**3.** The plurality opinion was authored by Justice Powell and joined by Chief Justice Burger and Justices O'Connor and Rehnquist.

tition for habeas relief with a supportable claim of innocence.

Moreover, the dissent argued that the *Sanders* Court specifically declined to define "ends of justice" so to permit district courts to exercise their discretion in deciding whether to rehear a petition for habeas corpus. The dissent wrote:

> For more than 30 years, our construction of the habeas statute to permit federal collateral review of virtually all nondefaulted constitutional claims ... without reference to actual guilt or innocence or to the competing interests of the state and the prisoner, has been unmistakably clear.

477 U.S. at 467, 106 S.Ct. at 2634.

The dissent concluded that the "ends of justice" test, as set forth in *Sanders*, was still the appropriate test. Moreover, the dissent noted the situation presented in the *Kuhlmann* case, involving an intervening change in the law, especially lent itself to the *Sanders* "ends of justice" test.

■ It is clear that the "ends of justice" must be served before a district court is required to consider a second petition for habeas relief which raises the same issues disposed of on the merits by an earlier ruling. What is less settled is whether the term "ends of justice," as set out in *Sanders*, has been redefined. The dispute, as presented in *Kuhlmann*, is whether that term should be left open-ended so that district courts are free to exercise their discretion in considering successive petitions for habeas relief or whether the term should be narrowly defined to encompass only one set of conditions—namely, factual innocence.

■ This court has resolved this dispute in favor of the former. In *Jacks v. Duckworth*,[4] we recently interpreted the plurality's opinion in *Kuhlmann*, 857 F.2d 394 (7th Cir.1988). We held that in *Kuhlmann* "a majority of the members of the Court expressly added another consideration to the 'ends of justice' analysis, that is, whether the petitioner has made a 'colorable showing of factual innocence.'" *Id.* at 399–400. We found that only a four-member plurality in *Kuhlmann* held that "the 'ends of justice' *require* federal courts to entertain [successive] petitions *only* where the prisoner supplements his constitutional claim with colorable showing of factual innocence." *Id.* at 400 (citing *Kuhlmann*, 477 U.S. at 454, 106 S.Ct. at 2627). Nevertheless, Justice Stevens writing separately agreed that a district court may properly take into consideration whether a petitioner established a "'colorable claim of factual innocence.'" *Id.* Thus, *Kuhlmann* holds that a colorable showing of factual innocence is *one* of the *many* factors which a district court may properly weigh when determining whether a petitioner has satisfied his burden of proof. Hence, *Sanders*, which leaves the "ends of justice" determination to the discretion of the district courts, has not been expressly overruled. Sulie was not required to make a colorable showing of factual innocence before filing his second petition for habeas corpus.

■ As we have already pointed out, the *Sanders* Court offered examples of situations in which the "ends of justice" would be served by reconsidering a habeas claim. One such example involved a change in the law between petitions for habeas relief. Where this change in the law related directly to the petitioner's claim, a hearing on the

---

**4.** Like this case, *Jacks* addresses successive petitions for habeas relief. The petitioner, Edward Dennis Jacks, shot his wife. Jacks contended that he was insane, however, he was convicted of first degree murder. In his third habeas corpus petition, Jacks raised the same issues that were decided on the merits in his previous petitions. First, he claimed that his due process rights were violated by the admission into evidence of his post-*Miranda* warning statement that he desired to remain silent about the shooting until contacting his attorney. Second, he claimed that his due process rights were violated by the jury instructions which allegedly created a mandatory presumption of intent that shifted the burden of persuasion from the State to him. *Jacks*, 857 F.2d at 395–96.

We affirmed the denial of habeas corpus relief because the intervening change in law failed to establish the unconstitutionality of Jacks' conviction, and thus, the "ends of justice" did not warrant a redetermination of his claim. *Id.* at 400.

second petition was justified. *Sanders,* 373 U.S. at 17, 83 S.Ct. at 1078.

■ The error below was not the district court's consideration of petitioner's lack of showing of factual innocence but the district court's failure to weigh that factor with the intervening change in law factor. We find even absent a showing of factual innocence that in this case the weight of the intervening change of law factor tips the balance in favor of Sulie's interest in relitigating and against the countervailing interests served by according finality to the prior judgment. We find that the "ends of justice" would be served by reconsidering Sulie's second petition for habeas relief on the merits.

### III.

■ Since we have determined that Sulie has met the requirements for filing successive petitions for habeas relief, we now address the merits of his claim. In doing so, we must first decide whether *Wainwright v. Greenfield* should be retroactively applied, and in determining this, we must decide whether *Greenfield* announces a new constitutional rule. In *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the Court stated:

> [W]hen a decision of this Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the *rule of the later case applies in earlier cases,* because the latter decision has not in fact altered that rule in any material way.

457 U.S. at 549, 102 S.Ct. at 2586 (emphasis added).

In *Johnson,* the respondent (before the court on direct appeal) sought retroactive application of a case which, though not entirely new and unanticipated, was not just a simple application of a new set of facts to settled precedent. Similarly, in this case, Sulie seeks to apply the rule announced in *Greenfield,* which is also more than a rote application of the principles announced in *Doyle.*[5] Therefore, like in *Johnson,* we are asked to apply retroactively a case which both applies and extends existing case law.

In *Johnson,* the Court applied a new decision to a later case despite the fact that the new decision involved more than just an application of new facts to existing case law. The Court found that the retroactive application of the new fourth amendment case law to cases pending on direct appeal would serve several interests, including treating similarly situated defendants similarly. The Court also briefly addressed retroactive application of the new case law to cases still pending on collateral review in a footnote in *Johnson.* The Court said:

> The logic of our ruling, however, is not inconsistent without precedents giving complete retroactive effect to constitutional rules whose purpose is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function. *See, e.g., Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977); *Ivan V. v. City of New York,* 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972). Depending on the constitutional provision involved, additional factors may warrant giving a *particular ruling retroactive effect beyond*

---

5. Although *Doyle* held that a defendant's post-arrest silence could not be used to prove his guilt, *Doyle* did not address first, whether a post-*Miranda* request for an attorney is equivalent to post-*Miranda* silence and second, whether a request for an attorney (or silence) can be used to rebut a defendant's insanity defense. These issues were newly resolved in *Greenfield.*

Yet, *Greenfield* was not an unanticipated extension of *Doyle.* Given the *Doyle* Court's emphasis on the importance of the *Miranda* warnings and a defendant's right to rely on those

warnings without fear that such reliance would later be used against him, it is logical to conclude that the protections accorded post-*Miranda* silence would be extended to a post-*Miranda* request for an attorney.

Nevertheless, the second prong of the *Greenfield* decision, relating to the use of post-*Miranda* silence to defeat an insanity defense, perhaps could not have been anticipated as easily. Thus, to some degree, although such an extension of *Doyle* is not unreasonable, this portion of the *Greenfield* decision is new case law.

*those cases pending on direct review. See Hankerson v. North Carolina,* 432 U.S. at 248, n. 2, 97 S.Ct. at 2347, n. 2 (Powell, J., concurring in judgment).

457 U.S. at 562 n. 21, 102 S.Ct. at 2594 n. 21 (emphasis added). This language in *Johnson,* suggests that where a petitioner seeks retroactive application of a new rule on collateral review, the new rule may have to meet the requirements of retroactive application normally reserved for newly announced constitutional rules, regardless whether it actually is a new rule or not. We will therefore review that standard.

In deciding the extent to which a decision announcing a new constitutional rule of criminal procedure should be given retroactive effect, the Court traditionally has weighed three factors. They are " '(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on old standards, and (c) the effect on the administration of justice of a retroactive application of new standards.' " *Solem v. Stumes,* 465 U.S. 638, 643, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984) (quoting *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967)).

*Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986). This test applies to cases on direct review as well as collateral review. 478 U.S. at 258 n. 1, 106 S.Ct. at 2880 n. 1.

In evaluating the first of these three factors the Supreme Court has said:

Where the major purpose of the new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect.... *Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971).

*Hankerson v. North Carolina,* 432 U.S. 233, 242, 97 S.Ct. 2339, 2344, 53 L.Ed.2d 306 (1977). However, where the new rule serves ends other than to "avoid unreliable results," the rule will not necessarily be applied retroactively. This is true whether the new case law involves fourth or fifth amendment concerns, although some ramifications of the fifth amendment's privilege against compelled self-incrimination "have more connection with trustworthy results than does the exclusionary rule designed to enforce the Fourth Amendment." 401 U.S. at 656 n. 7, 91 S.Ct. at 1153 n. 7.

Only when the degree to which the purpose of a new rule is designed to enhance the fact-finding process is small, should the court look to the second and third factors of the *Solem/Stovall* analysis. *Hankerson,* 432 U.S. at 244, 97 S.Ct. at 2345.

The question then is whether the purpose of the rule announced in *Greenfield* is to overcome some aspect of a trial that impairs the truth-finding function of the trial. An argument can be made that it does.

In *Greenfield,* the Supreme Court said:
[W]e have continued to reiterate our view that *Doyle* rests on "the *fundamental unfairness* of implicitedly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983).

474 U.S. at 291, 106 S.Ct. at 639 (emphasis added) (footnote omitted). The Court added, "*Doyle* and subsequent cases have thus made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the *fundamental fairness that the Due Process Clause requires.*" *Id.* (emphasis added) (footnote omitted). The Court concluded:

What is impermissible is the *evidentiary use* of an individual's exercise of his constitutional rights after the state's assurances that the invocation of those rights will not be penalized.

474 U.S. at 295, 106 S.Ct. at 641 (emphasis added). As Justice White explained in his concurrence in *United States v. Hale* (later quoted in *Doyle v. Ohio*):
[I]t seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence at the time of

his arrest and to insist that because he did not speak about the facts of the case at the time, ... *an unfavorable inference might be drawn as to the truth of his trial testimony....*

422 U.S. 171, 182–83, 95 S.Ct. 2133, 2139–40, 45 L.Ed.2d 99 (1975) (emphasis added).

As is evident from these various decisions, when the right to remain silent (or to request an attorney) is impugned, the truth-finding function of the trial is impaired.

Given the Supreme Court's recent affirmance in both *Greenfield* and in *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), of the principle that the Due Process Clause is violated when a defendant's post-*Miranda* silence is used to impeach him, we can only conclude that Sulie's right to due process is so fundamental that new law, affecting that right, must be retroactively applied even on collateral review.

### IV.

▮ As is evident from our earlier description, the holding in *Greenfield* is virtually identical to this case and there can be little doubt that the holding in *Greenfield* must be applied here. Thus, it was "fundamentally unfair ... [to use Sulie's] post-*Miranda* warnings silence [defined in footnote 13 as including a request for an attorney] as evidence of his sanity." 474 U.S. at 295, 106 S.Ct. at 641. We hold therefore, that the use of Sulie's post-*Miranda* request for attorney violated Sulie's right to due process and constituted an error of constitutional magnitude. *Jacks v. Duckworth,* 857 F.2d 394, 401 (7th Cir.1988).

### V.

The foregoing analysis requires us to decide if the error committed in this case was harmless in light of all the other evidence introduced at trial. In denying Sulie's first petition for a writ of habeas corpus, the district court held that given the overwhelming evidence both of Sulie's guilt and sanity, the single question put to Sulie's arresting officer, regarding Sulie's

request for an attorney, constituted harmless error.

▮ In this second go-around, the government argues the district court's finding of harmless error has not been affected by an intervening change in the law. Thus, the government contends Sulie must still supplement his second petition for a writ of habeas corpus with a colorable claim of innocence in order for the court to reconsider the issue of harmlessness.

We are not persuaded by the government's argument. The issue of harmlessness is ancillary to the issue of whether a constitutional error has occurred. In denying the first petition for habeas corpus, the district court found no error had occurred. When, however, new law says that the use of Sulie's post-*Miranda* request for an attorney to prove his sanity is a constitutional error, we must consider the issue of harmlessness anew.

▮ In *Ortega v. O'Leary,* 843 F.2d 258, 262 (7th Cir.1988), we said that "a defendant is entitled to a fair trial not a perfect one, *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436–37, 89 L.Ed. 2d 674 (1986), and a federal constitutional error is not automatically reversible." Rather, in reviewing the case as a whole, we must determine whether the error was harmless beyond a reasonable doubt.

> [I]n assessing whether errors of constitutional magnitude ... are harmless beyond a reasonable doubt, "we must determine 'whether there is a reasonable possibility that the [errors] complained of might have contributed to the conviction.'" [*United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1019 (7th Cir. 1987)].

*Mauricio v. Duckworth,* 840 F.2d 454, 459 (7th Cir.1988). Further, in *Fencl v. Abrahamson,* 841 F.2d 760 (7th Cir.1988), we explained:

> [O]ur task, in assessing whether [an] error was harmless beyond a reasonable doubt is not to engage simply in a reweighing of the evidence. Rather ... we must assess, as precisely as we can, the

impact of the objectionable material on the jury's verdict.

841 F.2d at 769.

The factors to consider in making this determination include:

the witness' testimony to the ... case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points ..., and of course, the overall strength of the ... case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

The objectionable evidence in this case consisted of one question and answer which came at the end of the direct examination of one of Sulie's arresting officers. The question itself was short and did not draw undue attention to Sulie's request to contact an attorney—nor did the question leave the jury with the feeling that something else was to follow.

[PROSECUTOR] Q. Officer, did you have occasion to see defendant Suley [sic] after he was arrested?

[OFFICER] A. Yes.

Q. And where did you see him?

A. At the station.

Q. When was this?

A. It was that morning after I came to work, after 9:00 o'clock.

Q. What would be the date?

A. It was the 25th.

Q. Approximately how many hours after the alleged shooting did you see the defendant, Eugene Suley [sic]?

. . . .

A. It had to be thirty (30) some hours, I guess.

Q. Describe the defendant's physical appearance at this time.

. . . .

A. Seemed relatively normal and calm to me.

Q. Did you advise him of his *Miranda* rights?

A. Yes.

Q. Did he appear to understand them?

[DEFENSE COUNSEL] Objection. Calls for a conclusion of witness.

[COURT] Sustained.

Q. Did he ever indicate to you that he didn't understand them?

A. No.

Q. Did he ask for any medical assistance at this time?

A. No.

Q. Did he ask to contact an attorney?

A. Yes.

[PROSECUTOR] I have no further questions of this witness.

As far as we can ascertain from the record before us, and there have been no assertions to the contrary, no other reference to Sulie's request for an attorney was ever made during the four-day trial. Defense counsel obviously did not cross-examine on this point and, although transcripts of closing arguments were not made available to us, there are no assertions that in its closing argument the state used Sulie's request for an attorney to argue that he was sane. Moreover, neither court-appointed expert used or even considered Sulie's request for an attorney in evaluating his state of mind.

From the record as a whole, it is clear that the objectionable inquiry, concerning Sulie's request to contact an attorney, was of no real consequence in the jury's determination.[6] This is especially true given that there was more than enough independent evidence of Sulie's sanity on which the jury could and did rely in rejecting Sulie's insanity defense.

---

**6.** We note that since the time of Sulie's trial, Indiana criminal law, controlling a plea of insanity, has been amended. Under the present state of the law, Sulie would be required to prove that he was insane at the time of the offense. Thus, the state, which no longer bears the burden of proof, would not be likely to ask the type of objectionable question asked in this case.

Two court-appointed doctors, specializing in psychiatry and familiar with Sulie's previous mental history, testified that although Sulie could be characterized as a paranoid individual, he was sane at the time he committed the murder. Moreover, the doctors indicated that although Sulie exhibited certain symptoms of paranoia, including hostility, belligerence, and garrulousness, he was able to appreciate the wrongful nature of his actions and therefore was sane under Indiana law.

Dr. Hogle, one of the court-appointed physicians, testified as follows:

[PROSECUTOR] Q. Can a person be hostile and still be sane within the meaning of Indiana law?

[DR. HOGLE] A. Yes.

Q. Can he not get along with his fellow employees and be sane within the meaning of Indiana law?

A. Yes.

Q. And can he be belligerent and still be sane within the law?

A. Yes.

Q. Can he be talkative and still be sane within the meaning of the law?

A. Yes.

Q. Can he be all those things and be sane within the meaning of the law?

A. Yes.

Q. Did you find the defendant Eugene Sulie to be suffering from mental illness or defect?

A. No.

Q. Did you find he lacks substantial capacity to appreciate the wrongfulness of his conduct.

A. No.

Q. Did you find he lacks substantial capacity to conform his conduct to the requirements of the law?

A. No.

Q. Is your opinion today still the same?

A. Yes.

[Testimony of Dr. Frank Hogle, trial transcript, pp. 512–13]. Dr. Evan Constain who diagnosed Sulie as having an anti-social personality with paranoid ideation, also testified that Sulie was sane at the time of the murder. [Trial transcript, pp. 343, 446, 456–58].

Paul Beckham, an officer of the Lake County Police Department, in charge of maintaining security at the Lake County jail, testified that Sulie was a model inmate who was congenial and well-liked by fellow prisoners. [Trial transcript p. 2634.] Additionally, the other arresting police officer testified about an exchange between himself and Sulie:

[PROSECUTOR] Q. And when you approached the window, you asked for a license?

[OFFICER] A. Yes.

Q. What was the defendant's response?

A. "Well, okay." He gave it to me.

Q. What then did you do in connection with this defendant?

A. I asked him if he had a picture. He did. He showed it to me.

Q. What if anything, did you do with Suley [sic]?

A. . . . . I asked him to step out of the car.

Q. Did he step out of the car?

A. Yes.

. . . .

Q. Did he respond to your questions?

A. Yes.

[Trial transcript p. 252]. From the exchange which occurred within 30 hours of the shooting, the jury could have inferred that Sulie was lucid and responsive.

In response to the substantial amount of evidence, introduced by the state's seven witnesses (not including the two doctors who were called as the court's witnesses) that Sulie was sane, the defense presented testimony by only Sulie's step-father and employer. That testimony revealed that Sulie was operating under certain false beliefs and that he had become tense and angry just before the murder. Defense counsel's cross-examination of the court-appointed doctors also revealed that their evaluation of Sulie could have been more thorough. But, nonetheless, both doctors held fast to their previous testimony that

Sulie was sane at the time of the murder. No additional medical evidence to the contrary was introduced.

Based on our review of the record, it is clear that there was more than sufficient evidence that Sulie was sane at the time of the murders. In light of the overwhelming evidence of Sulie's sanity and, given the context in which the one, small piece of objectionable evidence was introduced and the use, or rather, non-use—to which it was put—we now find that the prosecution's lone reference to Sulie's request for counsel did not contribute to the jury's decision that Sulie was sane. *United States ex rel Sanders v. Lane*, 835 F.2d 1204 (7th Cir. 1987).[7]

Because it did not become clear that an error had been committed in this case until *Greenfield* was decided, Sulie presented a sufficient reason for filing a successive petition for a writ of habeas corpus. Moreover, we find that *Greenfield* should have been retroactively applied to Sulie's case. However, we also find that the prosecution's one reference to Sulie's request for an attorney was harmless error. We therefore hold that the district court's dismissal of Sulie's second petition for a writ of habeas corpus is AFFIRMED.

**7.** Our holding today comports with that in *Sulie v. State*, 522 N.E.2d 380 (Ind.1988), wherein the Indiana Supreme Court ruled that the admission of the testimony regarding Sulie's request for an attorney, though constitutionally impermissible, was harmless error.